Joanna ANDRULONIS, Individually, and as Conservator of the Property of Jerome Andrulonis, Plaintiffs,

v.

UNITED STATES of America, Glatt Air Techniques, Inc., Glatt GmbH (Germany), Wisconsin Alumni Research Foundation, Inc., Dale Wurster, Warf Institute, Inc., Raltech Scientific Services, Inc., Ralston Purina Company, Eli Lilly and Company and John L. Thompson and Sons and Company, Defendants.

UNITED STATES of America, Third Party Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF HEALTH, Third Party Defendant.

No. 79–CV–847.

United States District Court,
N. D. New York.

Nov. 12, 1981.

184

Roemer & Featherstonhaugh, Albany, N. Y., for plaintiffs; Dean J. Higgins, Albany, N. Y., of counsel.

Anderson, Russell, Kill & Olick, P. C., New York City, Paul F. Donahue Associates, Alvin Sabo, Albany, N. Y., for defendant Glatt GmbH (Germany); Irene C. Warshauer, Marcy Louise Kahn, New York City, of counsel.

Carter, Conboy, Bardwell, Case & Blackmore, Albany, N. Y., for defendant Wisconsin Alumni Research Foundation; Jeffrey J. Tymann, Albany, N. Y., of counsel.

McNamee, Lochner, Titus & Williams, Albany, N. Y., for defendants Raltech Scientific Services, Inc. and Ralston Purina Co.; Paul Scanlon, Albany, N. Y., of counsel.

Maynard, O'Connor & Smith, Schenectady, N. Y., for defendant Warf Institute, Inc.; Richard Gershon, Schenectady, N. Y., of counsel.

Bouck, Holloway & Kiernan, Albany, N. Y., for defendant Dale Wurster; Stephen M. Kiernan, Albany, N. Y., of counsel.

Ainsworth, Sullivan, Tracy & Knauf, Albany, N. Y., for defendant Eli Lilly and Co. & John L. Thompson & Sons & Co.; Thomas F. Tracy, Albany, N. Y., of counsel.

Galef & Jacobs, New York City, for defendant Glatt Air Techniques, Inc.; Alan M. Warshauer, Christopher M. Houlihan, New York City.

George H. Lowe, U. S. Atty., Robert Abrams, Atty. Gen. of the State of New York, Department of Justice, Civil Division, Torts Branch, Washington, D. C., for defendant New York State Dept. of Health; William P. Fanciullo, Asst. U. S. Atty., James Tuttle, Asst. Atty. Gen., Albany, N. Y., M. Faith Burton, of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

This motion to dismiss for lack of personal jurisdiction (Fed.R.Civ.P. 12(b)(2)) requires this Court to determine the fairness of haling a foreign manufacturer into this forum. Numerous courts have erected verbal tests in attempts to give meaning to this area. After investigating those various superstructures, however, we tackle the core notion of fairness directly, and hold that it is reasonable to exercise jurisdiction.

### I.

Plaintiffs in this action have sued ten defendants for damages sustained by plaintiff Jerome Andrulonis' contraction of rabies. Their action arises under theories of negligence, strict products liability, breach of warranty, and the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1976).

Mr. Andrulonis was a senior bacteriologist at the New York State Department of Health's Griffen Laboratory, working to develop a method for mass rabies immunization of wildlife. His research was a joint effort of the New York State Department of Health and the federal government's Center for Disease Control. At the time he contracted rabies, Mr. Andrulonis was attempting to coat a uniquely hazardous strain of rabies vaccine onto sugar pareils in an air suspension encapsulation machine known as a "Uni-Glatt." Defendant Glatt GmbH, a West German company with its principal place of business in Binzen, West Germany, manufactures the Uni-Glatt. Defendant Glatt Air Techniques, Inc. (GAT) distributes the machines in the United States for Glatt. Plaintiffs claim, *inter* *alia*, that the Uni-Glatt was defectively manufactured. Glatt denies liability, and contends that insufficient contacts exist between this forum and Glatt to allow exercise of personal jurisdiction over the German company.

Werner Glatt, Glatt's founder and chief executive, owns all of the stock capital of Glatt GmbH. Glatt GmbH's Answers to Plaintiffs' Interrogatories No. 3 [Glatt GmbH Answers]. There are no shares of stock, shareholders, directors or officers in a GmbH; Mr. Glatt and his wife are the company's general managers. *Id.* Nos. 3–5.

Glatt GmbH depends heavily on international sales; exports have accounted for more than two-thirds of the company's total sales in each of the last five years. Exhibit A to Plaintiffs' Supplemental Memorandum of August 18, 1981 [Plaintiffs' Supplemental Memorandum]. Glatt's sales totalled $9.4 million in 1980. *Id.* Three distributors with the Glatt name exist: Glatt Maschinen und Apparatebau AG in Switzerland, Glatt-Labor Tecnic, S. A., in Spain, and Glatt Air Techniques, Inc., in the United States. Exhibit A to Glatt GmbH Answers; Exhibit G to Plaintiffs' Cross-Motion of September 4, 1980 [Plaintiffs' Cross-Motion]. Glatt units also are produced under license in Japan and Brazil. *Id.* In 1980, the U. S. market alone represented over a third of Glatt GmbH's international sales, and 26% of Glatt's total sales, almost as much as the company's domestic sales in Germany. Exhibit A to Plaintiffs' Supplemental Memorandum.

Glatt GmbH does not sell directly in New York. It is not licensed to do business in New York, and maintains no bank account, office or phone listing in the state. Werner Glatt Affidavit of June 16, 1980, ¶ 6 [Werner Glatt Affidavit]. Glatt Air Techniques, Inc., Glatt GmbH's sole U. S. distributor, handles all New York sales. GAT's Answers to Plaintiffs' Interrogatories ¶ 74 [GAT Answers]. GAT was incorporated in New York in 1973. Exhibit B to Plaintiffs' Cross-Motion. GAT's financial operations were managed in New York City until about April, 1976, when it joined the sales,

service and laboratory operations in New Jersey. Deposition of Howard Phykitt at 30–31 [Phykitt Deposition]. The New York company had total sales of $6.8 million in 1979 and $3.8 million in 1980. Exhibit A to Plaintiffs' Supplemental Memorandum, at 2. Between 1977 and 1981, GAT sold six machines in New York. *Id.* GAT also leases Glatt equipment to customers, including the machine in question. GAT Answers Nos. 60, 61; *id.* Exhibit B.

Werner Glatt exercises extensive control over GAT's operations. He was an incorporator of GAT, serves on its board of directors, and has been its president since late 1977. He presently owns 85% of GAT's stock. Glatt GmbH Answers No. 41. Mr. Glatt loaned more than $50,000 to GAT. Exhibit B to Plaintiffs' Supplemental Memorandum. He made sales trips to New York for GAT to promote Glatt GmbH products. *See* Phykitt Deposition at 25, 57; letter of June 12, 1975, from Paul Portje of GAT to Ciba Geigy Corp. Mr. Glatt could turn down sales orders made by GAT. Phykitt Deposition at 28. He decided the timing of equipment delivery to GAT customers. *Id.* at 26–27. Mr. Glatt advised GAT on its internal organization, and was involved in the company's personnel decisions. *Id.* at 40, 58, 60; Deposition of Paul Portje at 26 [Portje Deposition].

The Glatt-GAT relationship extends beyond Werner Glatt's personal involvement. Glatt GmbH trained various GAT employees in West Germany. Translation of letter of July 29, 1980, from Werner Glatt to Howard Phykitt, executive vice-president of GAT, at 2; Glatt GmbH Answers No. 21; Phykitt Deposition at 7. Glatt GmbH employees also travelled frequently to GAT's New Jersey office. Translation of letter of April 15, 1980, from Werner Glatt to Howard Phykitt, at 1 (discussing recent visits by Mr. Glatt, Mr. Geppert and Mr. Nowak); Portje Deposition at 29–30, 41, 42; Phykitt Deposition at 18–19, 21, 25, 57. GAT occasionally called the German corporation regarding individual sales. Phykitt Deposition at 33. Glatt GmbH sent its financial advisor to GAT to ensure that GAT's accounting system would comply with the German corporation's needs. GAT board of directors meeting minutes of January 28, 1977. While Glatt did not dictate prices for its products sold in the United States, Portje Deposition at 52, GAT set its prices by merely factoring a conversion ratio onto Glatt GmbH's price book. Phykitt Deposition at 34; Portje Deposition at 33–34. Most importantly, at various times GAT executives held the American company out to prospective customers as Glatt GmbH's subsidiary. Letter of October 21, 1975, from Howard Phykitt to Ciba Geigy Corp. of Suffern, New York ("Glatt Air Techniques of Germany has set up a subsidiary company in Norwood, New Jersey, which is Glatt Air Techniques, Inc."); GAT Newsletter of December 5, 1977, at 1 (Exhibit C to Plaintiffs' Cross-Motion) (referring to GAT's "parent" company in Germany); Phykitt Deposition at 54. Werner Glatt himself considered the German corporation to be GAT's parent, and the Glatt-GAT operation as one entity. Translation of letter of July 29, 1980, from Werner Glatt to Howard Phykitt, at 2 ("G.A.T. often only is the advisor on behalf of the parent company in Binzen [West Germany] . . . . The market has to be handled with mutual teamwork"); *id.* at 3 ("the customers must feel that G.A.T. and teamwork/cooperation with the parent company form a unity. . . . As Manager and Vice President of the House of Glatt in the U. S. you have to be completely aware of this."); letter of September 5, 1979, from Werner Glatt to Howard Phykitt, at 2 ("You must not first of all keep in mind the U. S. market, but also observe the local situation here [in Germany].")

GAT's advertising and correspondence also suggest the lack of distinction between the two companies. Note, for example, a letter of April 13, 1978, from Kenneth Olsen, GAT's manager of marketing services, to Colin Duffy, of Ayerst Laboratories:

> The Glatt Company is the world's leading manufacturer of fluid bed granulators, dryers, and coating apparatus for the Pharmaceutical Industry. Here at *our* Norwood, New Jersey, location we have a

development laboratory for use in testing various materials on *our* equipment. We extend an invitation to you and your associates to visit our laboratory to view *our* fluid bed spray granulators and dryers, as well as the Wurster coating equipment and automated pan coating system. Perhaps after discussing any application that you may have for the Glatt equipment, we can schedule tests with your product on *our* machines.

Exhibit D to Plaintiffs' Cross-Motion (emphasis added). An ad in the April 1979 issue of *Pharmaceutical Technology*, at 81, included the following copy: "Glatt—The Leader In Fluid Bed Technology—Here's How *We* Can Fit Into Your Process Plans.... Glatt Air Techniques, Inc." Exhibit E to Plaintiffs' Cross-Motion (emphasis added). Whether or not GAT created this and similar ads independently of Glatt, *cf.* Portje Deposition at 50, their effect indicates one integrated entity.

## II.[1]

■■ In a diversity action such as this, *Arrowsmith v. United Press International,* 320 F.2d 219 (2d Cir. 1963), instructs this Court to look to New York law to determine personal jurisdiction. Here, the relevant sections are New York CPLR 301 and 302. Plaintiffs bear the burden of establishing a prima facie jurisdictional basis. Once past that initial hurdle, plaintiffs must prove the jurisdictional facts at trial by a preponderance of the evidence. *United States v. Montreal Trust Co.,* 358 F.2d 239, 242 n.4 (2d Cir.), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966). *See also Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d 87, 92 (2d Cir. 1975); *J. Baranello & Sons v. Hausmann Industries, Inc.,* 86 F.R.D. 151, 154 (E.D.N.Y. 1980).

■ CPLR 301 allows a court to "exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." Case law interpretation of

that section has conferred personal jurisdiction over unlicensed foreign corporations that are "doing business" in New York. *Bryant v. Finnish National Airline,* 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965). While courts have stated various tests of "doing business," Judge Cardozo, as usual, provided the most memorable definition: personal jurisdiction exists over a corporation operating in New York "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917). *See also Liquid Carriers Corp. v. American Marine Corp.,* 375 F.2d 951, 953 (2d Cir. 1967) (doing business in New York is carrying out systematic and regular activity within the state); *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851, 853, *remittitur amended,* 20 N.Y.2d 737, 283 N.Y.S.2d 99, 229 N.E.2d 696, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967) ("continuous and systematic course" of doing business).

■ The cases clearly indicate that the systematic activities of a subsidiary or agent in New York may subject a foreign principal to personal jurisdiction. *Frummer, supra,* 19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 854; *Public Administrator v. Royal Bank of Canada,* 19 N.Y.2d 127, 131, 278 N.Y.S.2d 378, 381, 224 N.E.2d 877, 879 (1967); *Bryant, supra,* 15 N.Y.2d at 432, 260 N.Y.S.2d at 629, 208 N.E.2d at 441–42; *Taca International Airlines, S. A. v. Rolls Royce of England, Ltd.,* 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965). Additional factors beyond the parent-subsidiary relationship itself, however, are needed to establish personal jurisdiction over the foreign parent. *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 336, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925); *Bulova Watch Co. v. K. Hattori & Co.,* 508 F.Supp. 1322, 1334 (E.D.N.Y.1981). Courts have articulated two tests to determine when a

---

**1.** Much of the structure of the discussion in this section parallels Judge Weinstein's excellent, exhaustive opinion in *Bulova Watch Co. v.* *K. Hattori & Co.,* 508 F.Supp. 1322 (E.D.N.Y. 1981). As always, imitation is the sincerest form of flattery.

local representative's acts confer personal jurisdiction over a foreign company: first, if the relationship between the foreign and local corporations gives rise to a "valid inference" of an agency relationship; and second, if control by the foreign company over the local affiliate is so complete that the latter is, in fact, merely a department of the former. *Bulova, supra,* 508 F.Supp. at 1334; *Delagi v. Volkswagenwerk AG,* 29 N.Y.2d 426, 431–32, 328 N.Y.S.2d 653, 656–57, 278 N.E.2d 895 (1972). Both tests look to economic realities, not formal relationships. *Bulova, supra,* 508 F.Supp. at 1334.

Courts posit the "agency" and "mere department" theories of personal jurisdiction as separate principles, but in reality no bright line separates the two. *Id. See, e. g., Delagi, supra,* 29 N.Y.2d at 432, 328 N.Y.S.2d at 657, 278 N.E.2d at 897 (discussing both theories in the context of parent-subsidiary relationships). One commentator proposes a third view: the foreign corporation and its New York affiliate should be considered one for jurisdictional purposes where the two corporations constitute a "single economic entity." Wellborn, *Subsidiary Corporations in New York: When is Mere Ownership Enough to Establish Jurisdiction Over the Parent,* 22 Buffalo L.Rev. 681, 699–700 (1973). But as Judge Weinstein has sagely noted, the various verbal formulae all boil down to fairness. *Bulova, supra,* 508 F.Supp. at 1334. *See also* Clermont, *Restating Territorial Jurisdiction and Venue for State and Federal Courts,* 66 Cornell L.Rev. 411, 445 (1981) (true test is whether it is "reasonable to exercise power"). Thus, although beginning with traditional "agency" theory analysis, we proceed to incorporate explicitly factors in the fairness formula.[2]

In April, this Court found an agency relationship to exist between GAT and Glatt, but ordered an evidentiary hearing to determine the scope of that agency. Memorandum-Decision and Order of April 8, 1981,

at 6–7. The hearing and the supporting and opposing papers submitted demonstrate the agency's broad scope. *Frummer* and *Delagi* instruct us that common ownership is the necessary factor to determine an agency's broad scope. *Delagi, supra,* 29 N.Y.2d at 431, 328 N.Y.S.2d at 656, 278 N.E.2d at 896; *Frummer, supra,* 19 N.Y.2d at 538, 281 N.Y.S.2d at 45, 277 N.E.2d at 854. *See also* D. Siegel, New York Practice § 82, at 93 (1978). Werner Glatt supplies that crucial link here. True, GAT is not a formal subsidiary of Glatt: Glatt GmbH owns no GAT stock, and GAT's profits are not sent back to Germany. But Werner Glatt owns all of Glatt's stock capital and 85% of GAT's stock. As discussed above, he maintains extensive control over both Glatt and GAT. The magic words "parent-subsidiary" are not the key; the functional relationship is what matters. A parent-subsidiary relationship exists here in substance, if not in form. Like a bunraku puppet master, Werner Glatt controls both companies behind the legal black mask of corporate ownership.

■ Courts have articulated numerous factors in assessing the fairness of requiring a foreign party to defend itself in New York when it derives benefits from in-state activities. A clear majority of those considerations, both in number and significance, are present here.

1) GAT and Glatt share officers and directors. *Boryk v. deHavilland Aircraft Co.,* 341 F.2d 666, 667 (2d Cir. 1965); *Marantis v. Dolphin Aviation, Inc.,* 453 F.Supp. 803, 805 (S.D.N.Y.1978); *Tokyo Boeki (U. S. A.), Inc. v. SS Navarino,* 324 F.Supp. 361, 364 (S.D. N.Y.1971); *Taca, supra,* 15 N.Y.2d at 101, 256 N.Y.S.2d at 131, 204 N.E.2d at 330. Werner Glatt, Glatt GmbH's founder and chief executive officer, is president of GAT and serves on its board of directors. Glatt GmbH Answers No. 41. 2) GAT and Glatt are mutually dependent for sales and prof-

---

2. Thus, this methodology incorporates the stance of both the fox (discrete analysis) and the hedgehog (synthesis). "The fox knows many things, but the hedgehog knows one great thing." (*quoted in* Summers, *Pragmatic Instrumentalism in Twentieth Century American Legal Thought—A Synthesis and Critique of Our Dominant General Theory About Law and Its Use,* 66 Cornell L.Rev. 861, 874 n.36 (1981)).

its. *See Boryk, supra,* 341 F.2d at 668; *Marantis, supra,* 453 F.Supp. at 805 (discussing parent-subsidiary sales volume). Twenty-six percent of Glatt's total sales in 1980 were to GAT, its sole U. S. distributor, and most of GAT's income derives from sales and service of Glatt products. Exhibit A to Plaintiff's Supplemental Memorandum.

3) As in *Taca, supra,* 15 N.Y.2d at 101, 256 N.Y.S.2d at 131, 204 N.E.2d at 330, Glatt trains some GAT employees at the German corporation's Binzen plant. Glatt GmbH Answers No. 21; Phykitt Deposition at 7. 4) As in *Boryk, supra,* 341 F.2d at 668, and *Taca, supra,* 15 N.Y.2d at 101, 256 N.Y.S.2d at 131, 204 N.E.2d at 330, GAT places an order with Glatt after receiving them from customers. Phykitt Deposition at 28–32. 5) While Glatt GmbH itself made no loans to GAT, *cf. Boryk, supra,* 341 F.2d at 668, Werner Glatt loaned more than $50,000 to GAT. Exhibit B to Plaintiffs' Supplemental Memorandum.

6) GAT's and Glatt's accounting systems are correlated. GAT board of director meeting minutes of January 28, 1977. 7) Judge Weinstein noted in *Bulova, supra,* 508 F.Supp. at 1336–37, that companies with narrow product lines tend to be highly integrated and maintain tight controls over sales affiliates. Glatt's product line is restricted to fluid bed equipment, and as discussed above, the company maintains numerous operational controls over GAT. 8) GAT's relatively recent incorporation and dependence on Glatt also support a finding of jurisdiction. *See Bulova, supra,* 508 F.Supp. at 1337–38 (discussing stages in the evolution of multi-national corporations as one factor in determining when a subsidiary is sufficiently independent to find no jurisdiction over a foreign parent). The GAT-Glatt relationship corresponds to Judge Weinstein's use of the concept of "monocentrism," with the center of operations in

Germany. *Id.* at 1338. *See also id.* at 1343 (finding less independence in a sales and marketing subsidiary than in a manufacturing subsidiary); *Saraceno v. S. C. Johnson and Son, Inc.,* 83 F.R.D. 65 (S.D.N.Y.1979).

9) Finally, GAT's participation in the actions underlying the complaint by leasing the Uni-Glatt in question to the New York State Department of Health, strengthens a finding of jurisdiction. *Bulova, supra,* 508 F.Supp. at 1344; *SCM Corp. v. Brother International Corp.,* 316 F.Supp. 1328, 1334 (S.D.N.Y.1970). In sum, GAT and Glatt share a sufficient "corporate intimacy" to support jurisdiction. *Marantis, supra,* 453 F.Supp. at 805.[3]

■ In *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 121 (2d Cir. 1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968), the Second Circuit applied *Frummer* to hold that a foreign corporation does business in New York "when its New York representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." Both requirements are amply met here. *Aquascutum of London, Inc. v. S. S. American Champion,* 426 F.2d 205, 211 (2d Cir. 1970), interpreted New York case law to find that once solicitation occurs "in any substantial degree very little more is necessary to a conclusion of 'doing business.'" (citations omitted). Certainly Glatt's "conscious and systematic" activities "to establish, consolidate and expand" the important U. S. market satisfies the "very little more" than mere solicitation test. *Bulova, supra,* 508 F.Supp. at 1344. Moreover, Werner Glatt considered the U. S. market too important to Glatt GmbH's continued growth and profitability to continue using Chemi-

---

**3.** Some of the facts not present here in the jurisdictional calculas include the following: 1) GAT is not a wholly owned subsidiary of Glatt (*cf. Marantis v. Dolphin Aviation, Inc.,* 453 F.Supp. 803, 804 (S.D.N.Y.1978)); 2) warranties are given by GAT rather than by the foreign principal (*cf. Taca Int'l Airlines, S. A. v.*

*Rolls-Royce of England, Ltd.,* 15 N.Y.2d 97, 101, 256 N.Y.S.2d 129, 131, 204 N.E.2d 329, 330 (1965)); and 3) there does not appear to have been any interchange of working personnel between Glatt and GAT. *Cf. Tokyo Boeki (U. S. A.), Inc. v. SS Navarino,* 324 F.Supp. 361, 364 (S.D.N.Y.1971).

Pharm, a non-exclusive manufacturer's representative, as its agent. *Cf.* Portje Deposition at 4–8. GAT's ever-increasing contribution to Glatt's total earnings, plus the evolution of Glatt's world-wide operations, indicate that without GAT's continued existence, Glatt itself would now step into the U. S. market. Exhibit A to Plaintiff's Supplemental Memorandum (U. S. market steadily climbed from 3% of Glatt's total sales in 1976 to 26% in 1980). *See Bulova, supra,* 508 F.Supp. at 1337–38; *Wellborn, supra,* 22 Buffalo L.Rev. at 700. Given this context of GAT's importance to Glatt, and Glatt's control over its New York representative through Werner Glatt, it would be unfair for Glatt to be able to reap the benefits of increased sales yet escape jurisdiction, especially in an action arising out of GAT's activities that furthered Glatt's ends. *See Bulova, supra,* 508 F.Supp. at 1344–45.[4]

### III.

Plaintiffs have also met their burden to support personal jurisdiction over Glatt GmbH under CPLR 302(a)(3). In pertinent part, the provision allows the exercise of jurisdiction over a foreign entity that

(a) . . . in person or through an agent:

. . . . .

(3) commits a tortious act without the state causing injury to person or property within the state, . . . if [it] (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; . . .

Unlike 301, which confers jurisdiction over any act, whether or not related to the foreign corporation's acts in New York, 302(a) grants jurisdiction only "[a]s to a cause of action arising from any of the acts enumer-

ated in th[e] section." *See, e. g., Puerto Rico Maritime Shipping Authority v. Almogy,* 510 F.Supp. 873, 877 (S.D.N.Y.1981).

CPLR 302 is satisfied under both (3)(i) and (3)(ii) here. First, the Court's holding sustaining jurisdiction over Glatt under 301's "doing business" test a fortiori justifies jurisdiction under 302(a)(3)(i)'s identical language. J. Weinstein, H. Korn & A. Miller, CPLR Manual § 3.06[d], at 3–23 (rev. ed. 1980); D. Siegel, *supra,* § 88, at 103; McLaughlin, Practice Commentary to CPLR 302, C302:21, at 88 (McKinney) (all noting that 302's "doing business" language requires less activity than the 301 test). Second, both prongs of 302(a)(3)(ii) are met. As noted above, Glatt derives two-thirds of its revenue from interstate commerce. Moreover, the Court finds that Glatt expected or reasonably should have expected any defective products to have consequences in New York. The provision's expectation requirement is objective. *Allen v. Auto Specialties Mfg. Co.,* 45 A.D.2d 331, 333, 357 N.Y.S.2d 547, 550 (3d Dep't 1974).

The Court is mindful of the due process constraints overlaying 302(a)(3). The Supreme Court recently warned that to satisfy the due process clause, the corporation must "deliver[] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Glatt surely expected that New York citizens would buy its equipment. Glatt's own invoices reflect sales of at least six Glatt machines to New York customers between 1977 and 1980. Exhibit A to Plaintiffs' Supplemental Memorandum. Werner Glatt accompanied GAT officers to New York to promote his products. *See* Phykitt Deposition at 25, 57; letter of June 12, 1975, from Paul Portje to Ciba Geigy Corp. GAT made numerous sales presentations to other potential New York customers, some of

---

4. CPLR 301's "doing business" jurisdiction amply satisfies the minimum contacts requirements of due process. *See Intermeat, Inc. v. Am. Poultry, Inc.,* 575 F.2d 1017, 1022 (2d Cir. 1978). The due process clause, however, is an important element in CPLR 302 "long arm" analysis. *See* Section III *infra.*

which Glatt was undoubtedly aware. *See* Phykitt Deposition at 50–52; letter of July 29, 1980, from Werner Glatt to Howard Phykitt (discussing various specific potential customers and sales presentations).[5] Here, unlike the facts in *World-Wide Volkswagen*, New York sales of Glatt equipment are not an isolated occurrence, but "arise[ ] from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market in [New York]." 440 U.S. at 297, 100 S.Ct. at 567. Accordingly, "it is not unreasonable to subject [Glatt] to suit in [New York] if its allegedly defective merchandise has there been the source of injury to ... others." *Id. See also Prentice v. Demag Material Handling, Inc.*, 80 A.D.2d 741, 742, 437 N.Y.S.2d 173, 175 (4th Dep't 1981); *Darienzo v. Wise Shoe Stores, Inc.*, 74 A.D.2d 342, 347, 427 N.Y.S.2d 831, 834 (2d Dep't 1980) (long-arm jurisdiction held proper over manufacturer who placed allegedly defective product into interstate commerce and reasonably expected some of the products to be sold to New York customers).[6]

### IV.

We emphasize that the holding in this case is limited to sustaining personal jurisdiction over Glatt GmbH; no imputation of Glatt's substantive liability is suggested. *See Cannon Mfg. Co., supra*, 267 U.S. at 336–37, 45 S.Ct. at 251; *Frummer, supra*, 19 N.Y.2d at 538, 281 N.Y.S.2d at 45, 227 N.E.2d at 854.

The *Frummer* dissent worried about two possible abuses in haling foreign corporations into a New York forum: nonresidents might sue in New York, and a foreign cause of action might be tried here. 19 N.Y.2d at

546, 281 N.Y.S.2d at 52, 227 N.E.2d at 859. Whatever the validity of that view, those two problems are not present here: Jerome Andrulonis and his wife, both New York residents, sue on a cause of action arising in New York.

As the *Frummer* majority aptly noted, litigation in a foreign jurisdiction, while inconvenient, is the price that companies active in international trade must pay. "When their activities abroad, either directly or through an agent, become as widespread and energetic as the activities in New York conducted by [Glatt GmbH], they receive considerable benefits from such foreign business and may not be heard to complain about the burdens." 19 N.Y.2d at 538, 281 N.Y.S.2d at 45, 227 N.E.2d at 854. Accordingly, defendant Glatt GmbH's motion to dismiss for lack of personal jurisdiction is denied.

IT IS SO ORDERED.

---

5. The letter fails to indicate the locations of the individual customers. Even if none of them were in New York, however, the letter indicates the close contact between GAT and Glatt. Thus, it can be deemed that Glatt knew of sales presentations to corporations in New York.

6. The Court is aware that 302(a)(3) limits jurisdiction to tortious acts. *Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 324, 425 N.Y.S.2d 783, 785, 402 N.E.2d 122 (1980); *Amigo Foods Corp. v. Marine Midland Bank— New York*, 39 N.Y.2d 391, 396, 384 N.Y.S.2d

124, 127, 348 N.E.2d 581 (1976). From this, counsel for Glatt GmbH contends that the Court must dismiss at least plaintiff's breach of warranty claim. The Court's holding as to CPLR 301 jurisdiction, however, covers all of plaintiffs' claims. Moreover, *Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716 (2d Cir. 1980), squarely addressed and rejected an identical argument. Since all of plaintiffs' claims derive from a common nucleus of operative fact, they should be tried in one judicial proceeding. *See id.* at 718, 720.