Ilsa KLINGHOFFER and Lisa Kling-
hoffer Arbitter, as Co–Executrixes of
the Estates of Leon and Marilyn Kling-
hoffer, Plaintiffs,

v.

S.N.C. ACHILLE LAURO ED ALTRI–
GESTIONE MOTONAVE ACHILLE
LAURO IN AMMINISTRAZIONE
STRAORDINARIA; Commissario of
the Flota Achille Lauro in Amministra-
zione Straordinaria; Chandris (Italy)
Inc.; Port of Genoa, Italy; Club A.B.C.
Tours, Inc.; and Crown Travel Service,
Inc., d/b/a Rona Travel and/or, Club
A.B.C. Tours, Defendants.

Sophie CHASSER, et al., Plaintiffs,

v.

ACHILLE LAURO LINES, et
al., Defendants.

Viola MESKIN, et al., Plaintiffs,

v.

ACHILLE LAURO LINES, et
al., Defendants.

Donald SAIRE, et al., Plaintiffs,

v.

ACHILLE LAURO ED ALTRI–GES-
TIONE M/N ACHILLE LAURO
S.N.C., et al., Defendants.

Frank R. HODES and Mildred
Hodes, Plaintiffs,

v.

PALESTINE LIBERATION ORGANIZA-
TION, An Unincorporated Association,
John Doe, President, P.L.O, and Rich-
ard Roe, Treasurer, P.L.O., Defendants.

Donald E. SAIRE and Anna G.
Saire, Plaintiffs,

v.

PALESTINE LIBERATION ORGANIZA-
TION, and John Doe as President and
Don Roe as Treasurer of the Palestine
Liberation Organization, Defendants.

Nos. 85 Civ. 9303(LLS), 85 Civ.
9708(LLS), 86 Civ. 4657(LLS), 86 Civ.
6332(LLS), 88 Civ. 7137(LLS) and 88
Civ. 7281(LLS).

United States District Court,
S.D. New York.

June 7, 1990.

See also 109 S.Ct. 1976.

tion and trademark claims, we need not address the likelihood of success of the plaintiff's re-maining state law claims.

Healy & Baillie (John R. Geraghty, Raymond A. Connell, Andrew V. Buchsbaum, of counsel), New York City, for defendant Achille Lauro.

Kirlin, Campbell & Keating (Daniel J. Dougherty, Robert Higgins, of counsel), New York City, for defendant Chandris.

Rubin, Hay & Gould, P.C. (Rodney E. Gould, of counsel), Framingham, Mass., for defendant Crown Travel.

Ramsey Clark, Lawrence W. Schilling, New York City, for defendant PLO.

## OPINION AND ORDER

STANTON, District Judge.

The Palestine Liberation Organization (the "PLO") moves pursuant to Fed.R. Civ.P. 12(b)(1), (2), (5), (6) and 17(b) to dismiss the complaints and third-party complaints against it on the grounds of lack of subject matter or personal jurisdiction, insufficiency of service of process, failure to state a claim and lack of capacity to be sued. The motion was argued on March 8, 1989 but its consideration was deferred until April 1990 at the request of the parties, while they discussed other matters concerning these suits.

## BACKGROUND

Plaintiffs were passengers, or are the personal representatives of passengers, on the Italian passenger liner Achille Lauro, which was forcibly seized in the Mediterranean Sea in October 1985. During the course of the seizure, Leon Klinghoffer[1] was shot and his body thrown into the Mediterranean.

Plaintiffs assert that the seizure and murder were done by members of the PLO. The PLO denies responsibility for those acts, which it claims were done by its opponents in an effort to discredit it; and it asserts that its Chairman Arafat mediated a peaceful resolution of the piracy. (Transcript of Oral Argument held March 28, 1989 at 29–30).

---

1. Marilyn Klinghoffer sued in her individual capacity and as executor of her husband Leon's estate. After her death, Ilsa Klinghoffer and Lisa Klinghoffer Arbitter, as co-executors of both Marilyn and Leon's estates, were substituted as plaintiffs. That action will be referred to as the "Klinghoffer action."

A. The Parties and Jurisdictional Allegations

Plaintiffs sued the owner and charterer of the Achille Lauro, travel agencies and various other entities they claim failed to take sufficient steps to prevent, or warn of the risk of, the piracy. These complaints base jurisdiction on diversity of citizenship, 28 U.S.C. § 1332 (1988), admiralty, *id.* § 1333, or both. The Klinghoffer action alleges jurisdiction pursuant to diversity of citizenship, and asserts claims under state law, general maritime law and the Death on the High Seas Act ("DOHSA"), 46 U.S. C.App. §§ 761–767 (1982).

Defendants Chandris, Inc. and Crown Service Travel, Inc. impleaded the PLO, seeking indemnification or contribution for any damages awarded against them on plaintiffs' claims and compensatory and punitive damages against the PLO for tortious interference with their businesses. The third-party complaints allege diversity of citizenship, admiralty, federal question, 28 U.S.C. § 1331, and ancillary jurisdiction.

Later, other Achille Lauro passengers filed two actions directly against the PLO alleging diversity of citizenship jurisdiction.

B. The PLO and Its Activities in New York

The PLO describes itself as

the internationally recognized representative of a sovereign people who are seeking to exercise their rights to self-determination, national independence, and territorial integrity. The PLO is the internationally recognized embodiment of the nationhood and sovereignty of the Palestinian people while they await the restoration of their rights through the establishment of a coomprehensive [sic], just and lasting peace in the Middle East.

(Affidavit of Ramsey Clark sworn to April 27, 1987 ("Clark Aff.") ¶ 6).

The United States does not give diplomatic recognition to the PLO.

The General Assembly of the United Nations invited the PLO to participate in its sessions as an observer in 1974. G.A.Res. 3237, 29 U.N. GAOR Supp. 31 (Agenda Item 108) 4, U.N. Doc. A/9631 (1974). The Secretary–General of the United Nations accredited Zuhdi Labib Terzi as the PLO's Permanent Observer at the United Nations in New York. (Clark Aff. ¶ 2).

The United Nations established its headquarters in New York in the Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations (the "Headquarters Agreement"). *See* 22 U.S.C. § 287 note (1988) (setting forth the Headquarters Agreement). This agreement provides that United States federal, state and local authorities "shall not impose any impediments to transit to or from the headquarters district" by designated persons affiliated with the United Nations. Headquarters Agreement § 11.

The PLO, which has its own headquarters in Tunis, Tunisia, owns a building in Manhattan which it uses as its United Nations Mission (the "Mission").[2] (Affidavit of Zuhdi Labib Terzi sworn to May 5, 1986 ("Terzi Aff.") ¶ 2). Mr. Terzi and his family reside there, and the PLO has eight other employees at the Mission. (*Id.;* Crown Travel's Memorandum of Law in Opposition to PLO's Motion to Dismiss at 13). The PLO owns an automobile and maintains a bank account in New York, and has a telephone listing in the NYNEX Telephone Company directory ("white pages"). (*Id.* at 14).

Other high-ranking officers of the PLO have used the Mission, including Mr. Arafat and the PLO's information officer, Hatem Husseini. (Certification of Jay D. Fischer ¶ 3b).

The PLO asserts that the only work done at the Mission is related to the United Nations. (Terzi Aff. ¶ 2). Nonetheless, Mr. Terzi states: "As a part of my duties as Permanent Observer I must not only present the views of the PLO to the U.N.,

---

**2.** The deed to the Mission is in the name of Mr. Terzi, "in his capacity as the Permanent Observer, Head of Mission, of the Palestine Liberation

Organization to the United Nations, or his successor or successors Head of Mission." (Certification of Jay D. Fischer Exhibit A).

but present those same views to the interested public." (*Id.* ¶ 4). He asserts that he generally accepts all invitations to speak on radio or television within the headquarters district, and does so between six and eight times each year. (*Ibid.*). Mr. Terzi has not been given express authority to accept service of process on behalf of the PLO. (*Id.* ¶ 7).

The PLO contends that the United States carefully circumscribes the activities of Mr. Terzi and his staff to the headquarters district. The Anti–Terrorism Act of 1987, 22 U.S.C. §§ 5201–03 (1988) (the "ATA"), makes it unlawful to "receive anything of value except informational material from the PLO" or to "expend PLO funds from the PLO" if the purpose be to further the PLO's interests. *Id.* § 5202(1)–(2). The ATA also forbids establishing or maintaining "an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof." *Id.* § 5202(3). Since the ATA does not override the Headquarters Agreement, it does not affect the Mission. *United States v. Palestine Liberation Org.*, 695 F.Supp. 1456, 1464–71 (S.D.N.Y.1988).

### DISCUSSION

The PLO asserts several grounds for its motion for dismissal: (1) there is no subject matter jurisdiction because this case presents a nonjusticiable political question; (2) there is no personal jurisdiction over the PLO; (3) the PLO, assuming that it is an unincorporated association, lacks the capacity to be sued; and (4) service of process on Mr. Terzi in New York was insufficient.

### I. *The Nature of the PLO*

■ The PLO asserts that it cannot be sued as an unincorporated association because it is the embodiment of the Palestinian people and is structured and operates as a state.

"An unincorporated association is defined as a body of persons acting together and using certain methods for prosecuting a special purpose or common enterprise." *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 485 (1st Cir.) (citing Black's Law Dictionary 111 (5th ed. 1979)), *cert. denied,* 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 575 (1985). Another formulation of this definition is "a group of persons formed voluntarily without a charter for the purpose of promoting a common enterprise or objective." *Health Care Equalization Comm. of Iowa Chiropractic Soc'y v. Iowa Medical Soc'y,* 501 F.Supp. 970, 976 (S.D.Iowa 1980), *aff'd,* 851 F.2d 1020 (8th Cir.1988).

The PLO's purpose is to restore what its members and leadership believe to be the rights of the Palestinian people. Although it claims the attributes of a state, it controls no defined territory or populace and is not recognized by the United States. International law generally regards a "state" as " 'an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities.' " *National Petrochemical Co. of Iran v. M/T Stolt Sheaf,* 860 F.2d 551, 553 (2d Cir.1988) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 201 (1987)), *cert. denied,* —— U.S. ——, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989). That definition does not fit the PLO closely enough to justify treating it as a foreign sovereign or state in this litigation.

Rather, as its name indicates, the PLO is an organization. It is composed of individuals, without a legal identity apart from its membership, formed for specific objectives. For present purposes, it may be treated as an unincorporated association.

### II. *Subject–Matter Jurisdiction*

#### A. The Bases for Subject–Matter Jurisdiction

The complaints and third-party complaints allege various grounds for subject-matter jurisdiction.

■ These cases come within the admiralty jurisdiction of the federal courts. *See*

28 U.S.C. § 1333.[3] Admiralty jurisdiction exists where a tort occurs in navigable waters and the wrong has "a significant relationship to traditional maritime activity." *Executive Jet Aviation Inc. v. City of Cleveland, Ohio*, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). *See also Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 673–74, 102 S.Ct. 2654, 2657–58, 73 L.Ed.2d 300 (1982) (holding *Executive Jet* analysis applies outside aviation torts); *Keene Corp. v. United States*, 700 F.2d 836, 843 (2d Cir.1983).

The seizure of a ship in navigable waters is a traditional maritime wrong, and therefore these cases lie within admiralty jurisdiction. *See American Hawaiian Ventures, Inc. v. M.V.J. Latuharhary*, 257 F.Supp. 622, 627 (D.N.J.1966) ("every seizure by force on the high seas is *prima facie* piracy, and hence a maritime tort"). *See also Kelly v. Smith*, 485 F.2d 520, 523–26 (5th Cir.1973) (action for injury from rifle fire on small boat in Mississippi River is within admiralty jurisdiction under *Executive Jet*), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).

■■■ In addition, a plaintiff may bring an action for a maritime tort in state court or federal court under diversity jurisdiction under the "savings to suitors" clause of section 1333. *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1321 (11th Cir. 1989); *Neal v. McGinnis, Inc.*, 716 F.Supp. 996, 998 (E.D.Ky.1989); 14 Wright & Miller § 3672, at 431–433 (1985). Therefore, plaintiffs may bring these actions under diversity jurisdiction.[4]

■■■ Moreover, there is subject-matter jurisdiction over the Klinghoffer action's claims for the death of Mr. Klinghoffer under the DOHSA, which provides jurisdiction in federal district courts over claims for wrongful death on the high seas. 46 U.S.C.App. § 761 (1982).

## B. The Political Question Doctrine

■■■ The PLO argues that the issues of its liability for a terrorist attack are foreign policy questions not properly subject to judicial determination and that a court's resolution of them would infringe the foreign policy authority committed to other branches of government.

For a case to be considered to present such a political question, it must involve

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986).

It does not apply simply because a case has political implications. "The doctrine of

---

**3.** Section 1333 states in pertinent part:

The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

**4.** The PLO contends that there is no diversity jurisdiction over the claims brought directly against it because, as an unincorporated association, the citizenship of each of the PLO's members is considered when determining whether there is complete diversity. *Jaser v. New York Property Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir.1987). However, the parties' submissions on this issue are not adequate to permit a decision on it at this time.

which we treat is one of 'political questions,' not one of 'political cases.'" *Baker*, 369 U.S. at 217, 82 S.Ct. at 710. Nor is an issue a political question merely because it involves foreign affairs. *Id.* at 211, 82 S.Ct. at 706; *Japan Whaling*, 478 U.S. at 229–30, 106 S.Ct. at 2865–66; *Planned Parenthood Federation, Inc. v. Agency for Int'l Development*, 838 F.2d 649, 655 (2d Cir.1988).

The PLO relies on *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C.Cir.1984) (per curiam), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985), where plaintiffs sued the Libyan Arab Republic, the PLO and other Palestinian organizations for damages resulting from an attack on a civilian bus in Israel. *Id.* at 775.[5] Briefly and *per curiam*, the court dismissed the action. Each of the panel judges concurred, but with differing rationales. *Ibid.*

Judge Robb reasoned that the case presented a political question because it required "consideration of terrorism's place in the international order." *Id.* at 823. He stated that such claims might frustrate secret but necessary diplomatic contacts between the United States and terrorist or otherwise disreputable groups, and that judicial inquiry into terrorist attacks risked interference in affairs of state of the United States and foreign nations, the exclusive domain of Congress and the President. *Id.* at 824–25. Trial of such cases would result in "embarrassment to the nation, the transformation of trials into forums for the exposition of political propaganda, and debasement of commonly accepted notions of civilized conduct." *Id.* at 826. Finally, "Courts ought not to serve as debating clubs for professors willing to argue what is or what is not an accepted violation of the law of nations." *Id.* at 827.[6]

None of those considerations is present here. The PLO has condemned the Achille Lauro seizure and stated that it was an act of piracy. It is not at war with either Italy or the United States. No party asserts that the Achille Lauro seizure was legitimate.

The seizure of a ship on the high seas poses no value judgments or debatable issues of the law of nations. Acts of piracy are clear violations of international law. "In short, it is beyond controversy that attacking a neutral ship in international waters, without proper cause for suspicion or investigation, violates international law." *Amerada Hess Shipping Corp. v. Argentine Republic*, 830 F.2d 421, 424 (2d Cir.1987) (rights of neutral ships in time of war), *rev'd on other grounds*, 488 U.S. 428, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). *See also Tel-Oren*, 726 F.2d at 779, 781 (Edwards, J., concurring) (piracy is violation of law of nations); *United States v. Yunis*, 681 F.Supp. 896, 901 (D.D.C.1988) (hostage taking and aircraft piracy are violations of international law); *In re Extradition of Demjanjuk*, 612 F.Supp. 544, 556 (N.D. Ohio) (piracy is "paradigm" of offense against law of nations), *aff'd sub nom. Demjanjuk v. Petrovsky*, 776 F.2d 571 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986).

These are tort claims. They do not involve "policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch," *Japan Whaling*, 478 U.S. at 230, 106 S.Ct. at 2865–66 (1986), but familiar questions of responsibility for personal and property injuries. Indeed, there is no issue whether a tort was committed, but merely who committed it. The political question doctrine does not apply.

### III. *Personal Jurisdiction*

The PLO claims New York law furnishes no basis for jurisdiction over it. It also argues that basing jurisdiction on its Unit-

---

5. Plaintiffs brought the action under 28 U.S.C. § 1350 (1982), which provides district court jurisdiction over *actions by aliens for torts committed in violation of the law of nations or a treaty of the United States. Tel-Oren*, 726 F.2d at 775.

6. Neither of the other members of the panel, Judge Edwards and Judge Bork, held that the case presented a political question.

ed Nations-related activities would impair both the operation of the United Nations and treaty obligations of the United States.

### A. Personal Jurisdiction Under Section 301

■ Personal jurisdiction over these actions is determined according to New York law. It is clear that personal jurisdiction over nonresident defendants in diversity cases is determined by the law of the state in which the district court sits. *Cutco Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986); *Bachrach v. Keaty,* 698 F.Supp. 461, 463 (S.D.N.Y.1988). The Second Circuit has not yet determined whether personal jurisdiction over defendants in admiralty actions is determined by federal law or by the long-arm statutes of the state in which the district court is located. *See Koupetoris v. Konkar Intrepid Corp.,* 535 F.2d 1392, 1395 n. 13 (2d Cir.1976) (expressly declining to resolve issue); *Aquascutum of London Inc. v. S.S. American Champion,* 426 F.2d 205, 211 n. 4 (2d Cir.1970) (same). However, the rule prevailing in this district is that personal jurisdiction of an admiralty claim is determined pursuant to state law. *See, e.g., New York Marine Managers, Inc. v. M.V. Topor-1,* 716 F.Supp. 783, 785 (S.D.N.Y.1989); *Andros Compania Maritima S.A. v. Intertanker Ltd.,* 714 F.Supp. 669, 673–74 (S.D.N.Y. 1989); *Volkart Bros., Inc. v. M./V. "Palm Trader",* Nos. 88 Civ. 7527, 9094 and 0380 (S.D.N.Y. April 6, 1989) (available on WESTLAW, 1989 WL 34094).

Section 301 of New York's Civil Practice Law and Rules, which is the only section that might grant jurisdiction over the PLO, allows a court to exercise jurisdiction over defendant corporations that are "doing business" in New York.[7] *Laufer v. Ostrow,* 55 N.Y.2d 305, 449 N.Y.S.2d 456, 458, 434 N.E.2d 692, 694 (Ct.App.1982).

### 1. Applicability of Section 301's "Doing Business" Basis for Jurisdiction to an Unincorporated Association

■ The PLO contends that section 301 does not authorize jurisdiction over noncorporate defendants doing business in New York. The New York Court of Appeals has not yet decided that issue. *See Laufer,* 449 N.Y.S.2d at 460, 434 N.E.2d at 697 ("We may assume, without deciding, that an individual who is in fact doing business so as to be present within the State is subject to jurisdiction"); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 58 (2d Cir.1985) (stating that New York State Court of Appeals has not yet decided this issue).

Lower New York courts are split on whether section 301 applies to individuals. *Compare ABKCO Indus., Inc. v. Lennon,* 52 A.D.2d 435, 384 N.Y.S.2d 781, 784 (1st Dep't 1976) (section 301 provides for personal jurisdiction over individuals doing business in New York) *with Nilsa B.B. v. Clyde Blackwell H.,* 84 A.D.2d 295, 445 N.Y.S.2d 579, 583–84 (2d Dep't 1981) ("In our view, that section does not provide for jurisdiction in a paternity proceeding over a nondomiciliary who is served outside the State, regardless of whether the cause of action asserted in the petition is regarded as related to his personal contacts with New York." (footnote omitted)). A federal district court in New York has held that a non-resident individual doing business in New York is subject to jurisdiction pursuant to section 301. *Diskin v. Starck,* 538 F.Supp. 877, 880 (E.D.N.Y.1982).

Apparently, no court has yet decided whether section 301 applies to unincorporated associations. However, under New York law such jurisdiction is appropriate. In *Nilsa,* the Second Department declined to extend section 301 to reach individuals because "it is more appropriate for the Legislature than the courts to formulate previously unrecognized bases for jurisdiction." *Nilsa,* 445 N.Y.S.2d at 584. It stat-

---

**7.** Section 301 states: "A court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." N.Y. C.P.L.R. § 301 (McKinney 1990). The section was designed to ensure that the enactment of the C.P.L.R. in 1962 did not detract from any previously available grounds for obtaining personal jurisdiction. *Id.,* McLaughlin practice commentary.

ed that courts had earlier expanded New York's jurisdiction to cover corporations doing business in New York because of the "principle that a corporation, which can act only through its agents, is actually present in a state when it is engaged in business there through them." *Id.* at 585 (analyzing *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 115 N.E. 915 (1917)).

The reasoning that led to the exercise of jurisdiction over corporations is applicable here. It is true that New York does not consider an unincorporated association to be an entity separate from its members. *Martin v. Curran,* 303 N.Y. 276, 280, 101 N.E.2d 683, 685 (Ct.App.1951). However, New York permits actions against an unincorporated association by naming and serving either its president or treasurer. N.Y. Gen.Ass'ns Law § 13 (McKinney 1942 & Supp.1990). "Article 3 of the General Associations Law [providing for proceedings by or against unincorporated associations] in effect changed the procedure in an action against an unincorporated association for convenience purposes with the result that the procedure in such actions is similar to an action against a corporation." *Smith v. Robilotto,* 27 A.D.2d 684, 276 N.Y.S.2d 323, 325 (3d Dep't 1967) (procedure for examinations before trial of corporate officers apply to unincorporated associations).

Accordingly, even if section 301 does not extend to individuals, *Nilsa*'s concerns of unauthorized judicial expansion of jurisdiction over individuals do not apply to unincorporated associations. New York has recognized the collective character of unincorporated associations for some procedural purposes, and section 301's "doing business" basis for jurisdiction applies to the PLO. The rationale underlying section 301 supports this conclusion:

> While ordinarily it is a corporate defendant that will be subject to general jurisdiction for "doing business" under CPLR 301, the "doing business" test can be legitimately applied to all business entities, such as partnerships and unincorporated associations, and can even be applied to non-resident individuals. There is certainly no due process problem in subjecting all business entities and indi-

viduals to general jurisdiction on the basis of substantial and continuous contact with the forum. Moreover, equal treatment of defendants is desirable since the form of organization by which a defendant does business is irrelevant to any policy governing acquisition of jurisdiction.

> Before adoption of the CPLR, non-corporate defendants were not subject to general jurisdiction; even if doing business, they were subject only to specific jurisdiction for causes of action arising from New York activity. It could be argued that the language of CPLR 301 carries forward these limitations. Yet it is established that CPLR 301 does not freeze the "doing business" basis of jurisdiction as it existed before the CPLR, but rather allows the courts to develop and expand the doctrine of "doing business" to accord with appropriate policy and modern principles. Accordingly, recent well-reasoned authority has imposed general jurisdiction in New York even as to non-corporate defendants "doing business" in New York.

1 Weinstein, Korn & Miller, New York Civil Practice ¶ 301.15, at 3–30 to 31 (footnotes omitted; citing *ABKCO* and *Laufer* ).

### 2. Application of Section 301 to the PLO

■ A defendant is "doing business" under section 301 when it is engaged in such a continuous and systematic course of conduct here that it is "present" in New York. *Laufer,* 449 N.Y.S.2d at 458, 434 N.E.2d at 694 (citing *McGowan v. Smith,* 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321 (Ct. App.1981)). The test is whether the sum of the defendant's activities in New York is "such that it may be said to be 'present' in the State 'not occasionally or casually, but with a fair measure of permanence and continuity.' " *Ibid.* (quoting *Tauza* ). If a defendant is doing business in New York within the meaning of section 301, it may be sued on any claim, whether or not related to its New York activities. *Andrulonis v. United States,* 526 F.Supp. 183, 190

(N.D.N.Y.1981); *McGowan,* 437 N.Y.S.2d at 645, 419 N.E.2d at 323–24.

 The inquiry looks to "the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state." *Hoffritz,* 763 F.2d at 58. *See also Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 198–199 (2d Cir.1990) (office, real estate and personnel regularly working in state are "traditional signs of an entity doing business in the state in its own right.").

Here, the PLO's contacts with New York suffice for jurisdiction under section 301. The PLO owns a building in Manhattan, which it uses as a residence for Mr. Terzi and as an office. It maintains a telephone listing, a bank account and a number of permanent employees (a deputy, an executive secretary, two typists, a researcher, a doorman, a driver and a maintenance worker) in New York at an annual cost of approximately $360,000 exclusive of capital expenditures such as automobiles and furniture. Every month or two, Mr. Terzi speaks in public and to the media in New York in support of the PLO's cause.

Thus, the PLO has purposefully established a permanent and extensive presence in New York. While the United States strictly limits the PLO's activities, it still has constant and substantial contacts here. Courts have sustained jurisdiction pursuant to section 301 over defendants with similar or fewer contacts with New York. *See, e.g., Oral–B Laboratories, Inc. v. Mi–Lor Corp.,* 611 F.Supp. 460, 462 (S.D.N.Y.1985) (employee and principal shareholder maintained permanent office in New York and sales of $300,000 in Southern District of New York); *Ally & Gargano, Inc. v. Comprehensive Accounting, Corp.,* 603 F.Supp. 923, 924–25 (S.D.N.Y.1985) (extensive advertising, direct solicitation, trips to and conducting seminars in New York, participation in trade shows twice each year and servicing franchisees); *Bryant v. Finnish Nat'l Airline,* 15 N.Y.2d 426, 260 N.Y.S.2d 625, 629, 208 N.E.2d 439, 443

(Ct.App.1965) (corporation leased office, employed several people, maintained bank account and conducted public relations in New York and transmitted ticket requests overseas from New York); *Grunder v. Premier Indus. Corp.,* 12 A.D.2d 998, 211 N.Y.S.2d 421, 422 (4th Dep't 1961) (regular maintenance of organized sales force may amount to doing business if sufficiently large; defendant had no office, bank account or telephone listing in New York).

It is immaterial that the PLO's contacts with New York are not commercial in nature. Section 301 extends to nonprofit organizations and activities. *New York City Jaycees, Inc. v. United States Jaycees, Inc.,* 377 F.Supp. 481, 486 (S.D.N.Y.1974), *rev'd on other grounds,* 512 F.2d 856 (2d Cir.1975); *Weinberg v. Colonial Williamsburg, Inc.,* 215 F.Supp. 633, 639 (E.D.N.Y. 1963).

**B. The PLO's Claim to Immunity**

The PLO argues that parties with claims against it

cannot jeopardize the functions of the United Nations and organizations as diverse as the International Red Cross and the African National Congress by seeking to establish jurisdiction over representatives to the U.N. solely on the basis of their presence here, for acts which occured [sic] half a world away, totally unrelated to U.N. activities and which in this case were directed by others the PLO says intended to injure it by their conduct.

(PLO Memorandum of Law Following Oral Argument at 7).

 In support of this argument, the PLO submits a letter dated June 11, 1986 from the Legal Counsel to the United Nations, Carl–August Fleischhauer, Esq., to counsel for the PLO. The letter states that—

it is widely accepted that certain functional privileges and immunities flow by necessary intendment from the Headquarters Agreement and General Assembly resolution 3237 without which the invited entity would not be in a position to carry out its functions. Such func-

tional privileges and immunities certainly extend to immunity from legal process in respect of words spoken or written or any act performed in the exercise of the observer function.

Furthermore, since the permanent presence of the Palestine Liberation Organization in New York is a direct result of General Assembly resolution 3237 and is restricted to United Nations matters, that presence could appropriately be considered as not covering the receipt of service of legal process both personally and *in rem* in regard to matters completely unrelated to that presence.

It has also to be noted that the United States has never conferred recognition on the Palestine Liberation Organization Observer Mission and has certainly neither explicitly nor tacitly agreed to the performance on American soil of such official acts as the acceptance of process with effect for or against the Palestine Liberation Organization.

(PLO Reply Memorandum of Law, Exhibit A at 3).

The PLO contends that section 15 of the Headquarters Agreement precludes jurisdiction over it in these cases. However, section 15 does not give the PLO such immunity. Nothing in the Headquarters Agreement confers immunity upon the PLO. Nor could the United Nations unilaterally provide the PLO such protection.

Section 15 applies to "every person designated by a Member as the principal resident representative to the United Nations of such Member or as resident representative with the rank of ambassador or minister plenipotentiary"; to "such resident members of their staffs as may be agreed upon between the Secretary–General, the Government of the United States and the Government of the Member concerned"; to "every person designated by a Member of a specialized agency" as defined in the United Nations Charter "with the rank of ambassador or minister plenipotentiary at the headquarters of such agency in the United States"; and to "such other principal resident representatives of members to a specialized agency and such resident

members of the staffs of representatives to a specialized agency as may be agreed upon between the principal executive officer of the specialized agency, the Government of the United States and the Government of the Member concerned." *Id.* § 15(1)–(4). To those persons the United States gives "the same privileges and immunities, subject to corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it." *Id.* § 15(4).

The Headquarters Agreement also gives immunity to representatives of governments not recognized by the United States:

In the case of Members whose governments are not recognized by the United States, such privileges and immunities need be extended to such representatives, or persons on the staffs of such representatives, only within the headquarters district, at their residences and offices outside the district, in transit between the district and such residences and offices, and in transit on official business to or from foreign countries.

*Ibid.*

By its terms, section 15 applies to Members of the United Nations. The PLO is not a Member of the United Nations, but rather an observer, and section 15 gives it no claim to diplomatic immunity.

Whether, as suggested by Mr. Fleischhauer, "functional immunity" would be provided for the PLO's words or acts in its observer status is a point which need not be reached here. Any acts for which the PLO could be held responsible in these cases did not occur in connection with its observer function.

In support of its claim to "functional" immunity, the PLO points to *Investment Co. Inst. v. United States*, 550 F.Supp. 1213 (D.D.C.1982), in which the court, recognizing the unique character of the District of Columbia as the seat of the United States government, did not count the defendants' contacts and relationships with federal agencies in determining whether the defendants were present within that District for jurisdictional purposes. The theory

discounted the defendants' business contacts in the District by the amount they involved getting information from or giving information to the government, or getting the government's permission to do something, which can only be done in Washington because that is where the government is.

. . . . .

Those activities are prerequisites to defendants' engaging in the securities business anywhere in the country (if they can do so lawfully at all) which can only be accomplished in Washington.

*Id.* at 1216–17.

Regardless of whether the "government contacts" exclusion is limited to matters involving free speech or the right to petition the government, see *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 786–87 (D.C.Cir.1983), the analogy to the PLO and the United Nations is not persuasive. The PLO is not a subject (or even a Member) of the United Nations, bound to a relationship with its sovereign; nor are attending, observing and addressing the United Nations prerequisites to the PLO's activities elsewhere. Furthermore, unlike the citizen's relationship with Washington, the relationships of the Members, their staffs and representatives and the United Nations have been carefully defined in the Headquarters Agreement, and immunities have been provided as appropriate. There is no charter in the federal courts for expanding those immunities.

### C. Due Process

■■■ Exercise of jurisdiction over the PLO pursuant to section 301 also comports with due process. Basing personal jurisdiction on section 301 "amply satisfies the minimum contacts requirements of due process." *Andrulonis,* 526 F.Supp. at 190 n. 4 (citing *Intermeat Inc. v. American Poultry, Inc.,* 575 F.2d 1017, 1022 (2d Cir.1978)). The PLO has substantial, continuous and purposeful contacts with New York, and nothing in the record demonstrates that requiring it to litigate these claims, brought by United States residents, here will violate "traditional notions of fair play

and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). *See also United States v. Palestine Liberation Org.,* 695 F.Supp. 1456, 1461 (S.D.N.Y. 1988) (court had "no difficulty in concluding" it had jurisdiction over PLO in action under ATA to close PLO's United Nations Mission).

### IV. *Capacity To Be Sued*

Under Fed.R.Civ.P. 17(b):

The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, and (2) that the capacity of a receiver appointed by a court of the United States to sue or be sued in a court of the United States is governed by Title 28, U.S.C. §§ 754 and 959(a).

■■■ Therefore, in state-law claims the capacity of an unincorporated association to be sued is determined by state law. The PLO correctly asserts that under New York law an unincorporated association can be sued only by naming its president or treasurer. N.Y.Gen.Ass'ns Law § 13. *See also Markewich v. Adikes,* 422 F.Supp. 1144, 1147 (E.D.N.Y.1976) (New York "permits an unincorporated association to be sued only in the name of the president or treasurer of the unincorporated association.").

■■■ However, state law does not govern these actions. Whether these maritime tort claims are asserted under diversity or admiralty jurisdiction, federal maritime law

applies,[8] rather than the law of the state in which the court sits. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959); *Keefe*, 867 F.2d at 1321; *Larios v. Victory Carriers, Inc.*, 316 F.2d 63, 65 (2d Cir.1963); *Neal*, 716 F.Supp. at 998–99.

■■■ Under Rule 17(b), a plaintiff asserting a federal claim may sue an unincorporated association in its own name, even if state law does not so provide. *See Busby v. Electric Utilities Employees Union*, 323 U.S. 72, 73–74, 65 S.Ct. 142, 143–144, 89 L.Ed. 78 (1944) (per curiam); *Oyler v. National Guard Ass'n of United States*, 743 F.2d 545, 550 (7th Cir.1984) ("Federal Rule 17(b) provides that an unincorporated association has the capacity to be sued in its own name if such capacity is provided for under state law or if the action is based upon constitutional rights or the laws of the United States."). Under New York law, the PLO cannot be sued in its own name, but only in the name of its president or treasurer. However, since plaintiffs and third-party plaintiffs assert claims under federal law, Rule 17(b)(1) permits them to sue the PLO in its own name.[9]

The PLO argues that Italian law will apply to these actions, rather than "the Constitution or laws of the United States."

**8.** In a maritime tort claim brought in diversity, the savings to suitors clause of section 1333 preserves the plaintiff's right to a jury trial, although normally a plaintiff is not entitled to a jury in an admiralty claim. *Neal*, 716 F.Supp. at 998.

**9.** The phrase "no such capacity by the law of such state" in Rule 17(b) could be understood to refer to the "capacity to sue or be sued" stated earlier in the sentence, rather than the capacity to "sue or be sued in its common name," stated later. In that event, Rule 17(b) would allow federal claims against an unincorporated association in its own name only if state law provided no means of suing the association, in its own name or otherwise. The point is important here because under New York law an unincorporated association has the capacity to be sued, but only in the name of its president or treasurer. *See Markewich v. Adikes*, 422 F.Supp. 1144, 1147 (E.D.N.Y.1976). The PLO's capacity to be sued in its own name affects the manner of service of process, see Rule 4(d)(3), which matters because the PLO's chairman and treasurer are in Tunis, while Mr. Terzi is in New York.

Fed.R.Civ.P. 17(b). However, the parties have not briefed the choice of law issue, and at this point it is not clear which law will apply. *See Bilyk v. Vessel Nair*, 754 F.2d 1541, 1543–45 (9th Cir.1985) (factors used to determine what law applies include law of the flag, ship's base of operations, allegiance of defendant shipowner, inaccessibility of foreign forum, place of wrongful act, place of contract and law of the forum, applying factors set forth in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953)).

Moreover, even if federal choice of law rules require application of foreign law, these cases have been brought under federal maritime law. If it is determined that foreign law applies, it will be because federal law requires its use.[10]

## V. Service of Process

■■■ The PLO contends that service of process on Mr. Terzi, the PLO's Permanent Observer to the United Nations and the head of its activities in New York, is insufficient under Fed.R.Civ.P. 4.[11] It bases this argument on New York law, which permits service on an unincorporated association only by serving its president or treasurer. N.Y.Gen.Ass'ns Law § 13.

*Busby* and *Oyler*, in dicta, state that under Rule 17(b) an unincorporated association may be sued in its own name on a federal claim if state law does not allow it to be sued that way. That interpretation is the more natural reading of Rule 17(b), is consonant with its purpose of preventing state law from frustrating enforcement of federal rights, and is followed here.

**10.** Because federal law applies to these cases, the New York rule that the authorization, ratification or liability of each member of an unincorporated association must be pleaded and proved, see *Martin v. Curran*, 303 N.Y. 276, 101 N.E.2d 683, (Ct.App.1951), does not apply. *See Upper Lakes Shipping Ltd., v. International Longshoremen's Ass'n*, 33 F.R.D. 348, 350 (S.D. N.Y.1963).

**11.** The parties stipulated that Mr. Terzi is deemed to have been served with process in the third-party actions at the PLO's offices in New York, with the PLO reserving its rights to contest the effect of that service.

Third-party plaintiffs argue that service on Mr. Terzi was proper under Fed.R.Civ.P. 4(d)(3), which states that service may be made:

Upon a domestic or foreign corporation or upon a partnership or other unincorporated association which is subject to suit under a common name, by delivering a copy of the summons and of the complaint to an officer, a managing agent or general agent, or to any other agent authorized by appointment or law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires it, by also mailing a copy to the defendant.

Since Rule 17(b)(1) allows the PLO to be sued in its common name, Rule 4(d)(3) allows service on the PLO's managing agent. The issue whether an individual is a managing agent under Rule 4(d)(3) is one of federal law. 4A Wright & Miller § 1103, at 109–10 (1987).

"A general or managing agent must be invested with powers of discretion and must exercise judgment in his duties, rather than being under direct superior control as to the extent of his duty and the manner in which he executes it." *Grammenos v. Lemos,* 457 F.2d 1067, 1073 (2d Cir.1972) (citing Moore, Federal Practice § 4.22[2] (2d ed. 1970)). Service under Rule 4(d)(3) is not limited to titled officials of the association or those expressly authorized to accept service. " 'Generally, service is sufficient when made upon an individual who stands in such a position as to render it fair, reasonable and just to imply the authority on his part to receive service.' " *Montclair Elecs., Inc. v. Electra/Midland Corp.,* 326 F.Supp. 839, 842 (S.D.N.Y.1971) (quoting *American Football League v. National Football League,* 27 F.R.D. 264, 269 (D.Md. 1961)). *See also Insurance Co. of N. Am. v. S/S "Hellenic Challenger",* 88 F.R.D. 545, 547 (S.D.N.Y.1980) (quoting *Montclair* ); *Brown v. Gemological Inst. of Am., Inc.,* No. 83 Civ. 5668 (S.D.N.Y. June 27, 1984) (available on WESTLAW, 1984 WL 537).

The PLO is "doing business" in New York under section 301 of the C.P.L.R. such that it is "present" here. In such cases, "the person in charge of the activities that are found to constitute 'doing business' within the state usually is held to be an agent upon whom process can be served." 4A Wright & Miller § 1103, at 111–12 (footnote omitted). Mr. Terzi heads the PLO's substantial activities in New York. It is reasonable, therefore, to conclude that he is authorized to accept service, although he has not been expressly authorized to do so. Service on Mr. Terzi properly effected service on the PLO under Rule 4(d)(3).

## CONCLUSION

The PLO is present in New York. This court has subject-matter and personal jurisdiction, and the PLO has no immunity from suit. It was properly served. Its motion to dismiss is denied.