**Norman LAW, et al., Plaintiffs,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.**

**William HALL, Plaintiff,**

v.

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.**

**Doug SCHREIBER, et al., Plaintiffs,**

v.

**The NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Defendant.**

Nos. 94–2053–KHV, 94–2392–KHV and 95–2026–KHV.

United States District Court, D. Kansas.

May 29, 1996.

---

R. Lawrence Ward, Philip W. Bledsoe, Shughart, Thomson & Kilroy, Kansas City, MO, Charles J. Hyland, Sprint Communications Company L.P., Law Department, Kansas City, MO, Dennis Stewart, Jan M. Adler, Leonard B. Simon, Bonny E. Sweeney, Milberg, Weiss, Bershad, Hynes & Lerach L.L.P., San Diego, CA, for William Hall.

Lori R. Schultz, W. Dennis Cross, Morrison & Hecker L.L.P., Kansas City, MO, Robert G. Wilson, Cotkin & Collins, Los Angeles, CA, Gerald I. Roth, Allentown, PA, for Doug Schreiber, Lazaro Collozzo, Robin Dreizler, Frank Cruz, Norman Law, Andrew Greer, Peter Herrmann, Michael Jarvis, Jr., and Charles M. Rieb.

Linda J. Salfrank, John J. Kitchin, Swanson, Midgley, Gangwere, Kitchin & McLarney, L.L.C., Kansas City, MO, Craig T. Kenworthy, Swanson, Midgley, Gangwere, Kitchin & McLarney, L.L.C., Overland Park, KS, William C. Barnard, Gayle A. Reindl, Sommer & Barnard, P.C., Indianapolis, IN, for National Collegiate Athletic Association.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Since 1985, the National Collegiate Athletic Association ("NCAA") has collected detailed information from NCAA member institutions concerning revenues and expenses of intercollegiate athletic programs. To this end, the NCAA has surveyed its members on a broad array of expense and revenue issues [1] and has published every four years a comprehensive analysis of financial trends and relationships in intercollegiate athletic programs. In 1991, in reliance on such data, the NCAA promulgated a restricted earnings rule which, as the Court held in its amended *Memorandum and Order* (Doc. # 110) of August 2, 1995, violates federal antitrust law. Faced with a court order to collect and disgorge similar information, so that the victims of the NCAA's unlawful conduct may secure

[1] Among other topics, the surveys seek information on total revenues for football, basketball and every other collegiate sport; total revenues not related to specific sports; total revenue by athlete gender; total gender-related revenues; total ticket sales to the public and to university faculty, staff and students; post-season compensation from bowl games, tournaments and television; NCAA and conference distributions; revenues from student activity fees; revenues from away games; contributions from alumni and others; revenues from direct state and federal governmental support; total institutional support; revenues from concessions, radio and television, special events, program sales and advertising, signage/sponsorship/royalties, sports camps and all other sources. The surveys also seek the following information about expenses: total operating expenses for football, basketball and every other sport; operating expenses not related to specific sports; total expenses by gender; total gender-related expenses; expenses not directly related to either men's or women's programs; and total athletics operating expenses, including grants-in-aid, guarantees and options paid, salaries, wages, fringe benefits, team travel, scouting and recruiting, athletics equipment, uniforms, supplies, fund-raising, insurance, contract services (medical, legal, game officials, ticket sellers, etc.), debt service and capital expenditures. In addition, the surveys seek the total numbers of athletes, coaches, grants-in-aid and noncoaching personnel.

the relief afforded them by federal law, the NCAA insists that information of this type is available only to its members[2] and that the NCAA has neither the obligation nor the ability to provide it.

This matter comes before the Court on *Plaintiffs' Motion for Sanctions* (Doc. # 258) filed March 13, 1996. On March 19, 1996, the Court ordered the NCAA to produce various documents and to show cause why sanctions up to and including entry of default judgment should not be entered against it. Having considered the arguments of counsel, along with the evidence introduced at a hearing on March 29, 1996, the Court finds that plaintiffs' motion should be sustained and makes the following findings and order.

### *Procedural Background*

On August 2, 1995, the Court entered an amended order granting summary judgment to plaintiffs on the issue of liability under § 1 of the Sherman Act. *Memorandum and Order* (Doc. # 110). Shortly thereafter, the Court conducted a scheduling conference and entered a scheduling order (Doc. # 121) which set plaintiffs' damage claims for trial on June 4, 1996.[3] In the scheduling order, the Court directed the NCAA on or before September 15, 1995, to initiate steps to obtain by October 15, 1995, the names, addresses, university affiliations and positions of all potential restricted earnings class members, or to show cause in writing why the Court should not order it to do so. The obvious purpose of this order was to begin the process of identifying individual members of the potential plaintiff class. The NCAA did not gather the foregoing information, but on October 16, 1995, it filed a report regarding the steps it had taken to identify potential class members. *NCAA's Report to*

*the Court Regarding Steps Initiated to Obtain Information Regarding Potential Restricted Earnings Class Members* (Doc. # 147). Days later, plaintiffs filed a motion asking that the NCAA be ordered to show cause why it had failed to comply with the Court's order directing the NCAA to provide class identification information to plaintiffs on or before October 15, 1995. Plaintiffs' motion also asked that defendant be compelled to answer plaintiffs' second interrogatories. *Plaintiffs' Motion to Compel and Motion to Show Cause Why Defendants Should Not Be Held in Contempt of Court* (Doc. # 150) filed October 18, 1995.

In an effort to determine the most inexpensive and efficient way to get the information about potential class members on the table, the Court scheduled a conference for October 26, 1995. In response to plaintiffs' complaint that the NCAA had not provided even "the most basic information" necessary to identify potential class members and had not even started to get their names, counsel responded that the NCAA had "extensive experience in surveying their members"; that the NCAA was attempting to develop a survey to collect not only the information outlined in the scheduling order but also the somewhat expanded information requested in plaintiffs' second interrogatories; and that the NCAA had no problem including in the survey the information sought in plaintiffs' second interrogatories. *Transcript of Hearing on October 26, 1995* (Doc. # 207) at 7, 10 and 13. The Court, in reliance on NCAA assurances that it would do what was necessary to prompt the most expedient and thorough collection of survey responses, and obtain the necessary information, sustained plaintiffs' motion to compel but declined to order sanctions. *Id.* at 15.[4]

2. According to the 1993 edition of the NCAA's *Revenues and Expenses of Intercollegiate Athletic Programs* report, however, usable survey response rates ranged from 60 to 81 percent for Division I–AAA through Division I–A; from 48 to 51 percent in Division II (with or without football); and from 46 to 50 percent in Division III (with or without football). Some 492 institutions completed the NCAA's eight-page survey which requested, on a purely voluntary basis, the information outlined in footnote 1 above, and more.

3. Because of the NCAA's refusal to permit discovery, the Court has been required to postpone the trial to October 1, 1996.

4. During the conference, counsel engaged in lengthy colloquy regarding whether the survey would be characterized as a voluntary information-gathering instrument for NCAA purposes or a discovery device mandated by court order. *Transcript of Hearing on October 26, 1995* (Doc. # 207) at 14–17. That colloquy included the

Approximately ten days before the meeting of counsel, on October 17, 1995, plaintiffs had served their third interrogatories. Those interrogatories, which were three in number, sought information regarding Division I and Division II athletic programs as it related to plaintiffs' economic theories on class certification and damage issues. Plaintiffs later agreed to restrict the scope of their third interrogatories to Division I members. It is with the third interrogatories, thus narrowed, that we deal.

On November 16, 1995, the NCAA served responses and objections, but no substantive answers, to plaintiffs' third interrogatories.[5] In response to Interrogatory No. 1, the NCAA agreed to make available under Rule 33(d) of the Federal Rules of Civil Procedure business records from which plaintiffs might ascertain "the names of the coaches employed by NCAA member institutions, in each sport, beginning in 1990 (without designation of position) continuing through and including the 1993–94 academic year."[6] In response to Interrogatory No. 3, the NCAA also agreed to make available business records from which plaintiffs might ascertain "the information in the NCAA's custody and control which is responsive to Interrogatory No. 3, including, but not limited to, compilations of season and championship records, by sport, for each year designated [1985 to date]."[7] In response to Interrogatory Nos.

following assurances by NCAA counsel William C. Barnard:

> MR. BLEDSOE [for plaintiffs]: If I might jump in. Regardless of the nuance, I think something that carries the seal of an Article III, Section 2 [sic], judge is going to be most expeditious in getting this moved along. I think a statement to the effect that this is in lieu of individual subpoena and depositions, frankly—
> MR. BARNARD: That's a good suggestion.
> MR. BLEDSOE:—of member institutions—
> THE COURT: In order to reduce the cost of litigation.
> MR. BARNARD: I like that a lot.
> MR. BLEDSOE: That is what it is, the alternative of going out to these folks.
> MR. CROSS [for plaintiffs]: Or just to say in order to comply with the Court order.
> MR. BARNARD: We are asking you to do thus and so. That is fine, too. I don't have any problem with that.
> *Id.* at 16–17.

1 and 3, however, the NCAA objected as follows:

> As set forth more fully in the NCAA's Motion for Protective Order and accompanying memorandum in support, filed today, and incorporated herein by this reference, the NCAA ... OBJECTS in that [the interrogatories] improperly assume[ ] that the defendant maintains custody and control of any and all information maintained by NCAA member institutions. Except as specifically indicated, below, the NCAA does not compile or maintain the information requested in [the interrogatories] and therefore lacks sufficient information on which to respond. Finally, the NCAA OBJECTS in that the interrogator[ies] seek[ ] information which may have been provided to the NCAA by some member institutions for the sole and exclusive purpose of contributing to national research regarding intercollegiate athletics, and that such information was provided to the NCAA by some member institutions pursuant to an express pledge of confidentiality.

In response to Interrogatory No. 2, the NCAA lodged the same objection, asserting that the question "improperly assumes that the defendant maintains custody and control of any and all information maintained by NCAA member institutions." It added, however, that the NCAA "does not compile or maintain the information requested...."[8]

**5.** John J. Kitchin, general counsel for the NCAA and counsel of record in this case, signed the responses and objections on behalf of the NCAA.

**6.** For each Division I member from 1985 through 1996, Interrogatory No. 1 asked the sport and title of each coaching position; its annual salary, benefits and perquisites; the terms of any agreements concerning income from outside sources; championship bonuses (available or paid); and performance or other incentive bonuses (available or paid).

**7.** For each Division I member from 1985 through 1996, Interrogatory No. 3 asked, for each sport, the member's budgeted and actual expenditures; total revenue; win-loss record; conference affiliation; conference standings; post-season tournament bids and seeds, if any; and national rankings.

**8.** For each Division I member from 1985 through 1996, Interrogatory No. 2 asked what

The NCAA's motion for protective order, incorporated by reference in its objections to interrogatories, argued that "[t]he NCAA has answered [plaintiffs' third] interrogatories by providing all information known to any of its employees or agents, or obtainable from records in its or any of those persons' possession, custody, or control." *Brief in Support of Defendant's Motion for Protective Order* (Doc. # 169) filed November 16, 1995, at 2.[9] It also argued that the information sought by plaintiffs was "as available to them as it is to the NCAA," *id.* at 13, and that the NCAA should therefore be relieved of any obligation to answer.

On November 27, 1995, in a telephone conference that was not transcribed, the Court denied the NCAA's motion for a protective order and overruled its objections to plaintiffs' third interrogatories.[10] Several days later, on December 1, 1995, the Court issued a written order overruling the NCAA's motion for a protective order. *Order* (Doc. # 184). That order characterized the NCAA's position as frivolous and inconsistent with defense counsel's obligations as officers of the Court, and observed that the approach advocated by the NCAA (that plaintiffs be required to travel to approxi-mately 300 Division I institutions and secure the requested information through subpoenas and depositions) was "the single most time-consuming and expensive procedure through which the requested information could be obtained—not just for plaintiffs but for the member institutions and the NCAA itself." *Order* (Doc. # 184) at 3. The same day that the Court issued this order, the NCAA filed a so-called "report to the Court," *Defendant's Report to the Court Regarding Plaintiffs' Third Interrogatories* (Doc. # 183), in which it "respectfully decline[d]" to survey its members to obtain the requested information and reargued its position that plaintiffs should get the requested information (if at all) by issuing subpoenas and taking depositions. In the alternative, the NCAA argued that if it was required to survey its members, it should be allowed to advise them that they were under no obligation to respond. *See Defendant's Report to the Court Regarding Plaintiffs' Third Interrogatories* (Doc. # 183) at 3.

The parties thereafter engaged in fruitless efforts to craft prefatory language which advised NCAA member institutions about the purpose of the survey and their obligations

---

athletic camps or clinics were sponsored or run by the member or any of its employees, and what compensation was paid to members' employees for work at such camps or clinics.

9. In support of its argument that the NCAA could not require member institutions to provide the necessary information and could not sanction members who refused to provide it, the NCAA argued as follows:

The terms and conditions of membership in the NCAA, and the rules by which member institutions agree to conduct themselves, are contained in a 512–page document called the NCAA Manual. That manual consists of the NCAA's constitution, operating bylaws, and administrative bylaws. It provides specific and limited situations in which member schools must provide information to the NCAA or allow the NCAA access to their records. Aside from members' obligation to provide an annual "certification of compliance" to the NCAA (Administrative Bylaw 30.3), all instances in which members must provide information to the NCAA arise only after a member has been alleged to have violated a specific provision of the NCAA Manual, such as an alleged commission of a recruiting violation. And only in the situation of a violation is the NCAA empow-ered to impose a sanction upon a member, either for the violation itself or for the failure to provide the required information.
*Brief in Support of Defendant's Motion for Protective Order* (Doc. # 169) at 8.

10. The basis for the Court's holding concerning the motion for a protective order was straightforward and clear: the Court rejected the argument that the information requested in plaintiffs' third interrogatories was unavailable to the NCAA. The NCAA's position on the issue of availability was not factually credible. The record presented to the Court in conjunction with the summary judgment motions demonstrated that the NCAA not only could collect but had collected from its members information of the very type requested in plaintiffs' third interrogatories. In addition, the NCAA had agreed to collect from its members the information responsive to plaintiffs' second interrogatories, and it apparently did so with no problem. It is now clear that NCAA responses to Interrogatory Nos. 1 and 3 inherently contradict any argument that the NCAA could not gather the requested information from its members. The NCAA has admitted that, as of November 16, 1995, it had in its possession a substantial amount of information which, according to its motion for a protective order, it did not have and could not get.

with respect thereto. As a result, as of January 26, 1996—two months after the Court had issued its order overruling the NCAA's motion for a protective order and objections to plaintiffs' third interrogatories—the NCAA still had made no effort to answer plaintiffs' interrogatories or to gather the responsive information. Consequently, on January 26, 1996, the Court conducted another conference with counsel. At the conference, the Court stated that it was not going to "micromanage" the NCAA survey language and ordered as follows:

> [T]he bottom line here is that those interrogatories have been served. There was a motion for protective order, which is overruled. There's a motion to compel, which I sustained. And so the NCAA has to figure out a way to get those interrogatories answered and if you want to send a survey, that's fine. If you have got a better way of getting it done, I'll let you figure out how to do it. But I'm going to give you 30 days, until February 26th, to get those answers on file.

*Transcript of Hearing on January 26, 1996* (Doc. # 246) filed February 14, 1996, at 23. The NCAA counsel responded that "within the time frame that the Court set, February 26th, to answer the interrogatories, we don't have any problem with that." *Id.* at 26.[11]

On February 8, 1996, nearly four months after plaintiffs had served their third interrogatories, the NCAA made its first and only attempt to gather the information responsive thereto. Specifically, the NCAA sent each Division I member a questionnaire seeking the information necessary to prepare interrogatory answers, along with a cover memorandum from Cedric W. Dempsey, NCAA

Executive Director. As is evident from its text, Mr. Dempsey's memorandum was transparently designed to discourage responses. It stated as follows:

February 8, 1996

TO: Chief Executive Officers of NCAA Division I Member Institutions and Division I Conference Commissioners.

FROM: Cedric W. Dempsey.

SUBJECT: Restricted–Earnings Coaches.

As most of you know, the NCAA has been defending three lawsuits brought by 10 current or former restricted-earnings coaches challenging the legality of the rule that created that position. When it was learned that the judge was going to decide (erroneously, we believe) that the rule violated the federal antitrust laws, the compensation limitations of the rule were immediately rescinded. Since that time, the cases have proceeded, and they are currently set for a damage trial in October. As part of the pretrial proceedings, the plaintiff coaches have submitted a set of three written interrogatories seeking an enormous amount of economic information regarding all coaches' salaries, athletic budgets and the like to assist them in the calculation of damages against the NCAA. The NCAA objected to these interrogatories on a number of grounds. In substance, the court overruled the NCAA's objections and ordered the NCAA to attempt to obtain the information from its member institutions. The NCAA has been furnished a questionnaire by the lawyers for the plaintiff coaches to accomplish that purpose, and a copy, containing instruc-

---

**11.** Plaintiffs' counsel asked that the Court clarify its order, as follows:

> MS. SCHULTZ: Your Honor, just so I'm clear, by February 26th, the NCAA is to answer all the third interrogatories, not just the information that the NCAA may presently have in its possession? * * *
> THE COURT: Right.
> MS. SCHULTZ: Well, I just don't want to end up back here on February 26th, with the NCAA saying we just don't have it in our possession and we just can't get it or we'll be back where we started.
> THE COURT: I have found when I overruled the motion for protective order that the infor-

mation was not unavailable to the NCAA and the NCAA is ordered to produce it, and I can't be any more clear than that.

*Id.* at 31–32. In response to Ms. Schultz's opening query, NCAA counsel implored her, "We'll answer [the third interrogatories] the best we know, we can. That's all we can do." In recent pleadings, the NCAA has attempted to characterize the Court's response to Ms. Schultz's question as a blessing on the NCAA's position that it need only provide information in its custody and possession. The context and the import of the Court's remark were obvious to those who attended the conference, however, and the NCAA cannot fairly argue otherwise.

tions for completion prepared by plaintiffs' counsel, is enclosed.

The Court has *not* ordered any member institution to supply the information or to complete the questionnaire. It is our counsel's view that the only way any institution can be compelled to furnish the information is for the plaintiffs to obtain a lawfully issued deposition subpoena directed to that institution from a court in the district in which the institution is located. If such a subpoena were to be issued, the institution would have the right to challenge its propriety in the local district court. As we must, we leave to each institution the decision as to whether the questionnaire should be completed. Stated in another way, the decision to complete or not complete the questionnaire is a purely voluntary one by each individual institution. We urge you to consult your counsel in reaching that decision. If you or your counsel have any questions, please feel free to contact the NCAA's trial counsel:

Mr. William C. Barnard
Sommer and Barnard
4000 Bank One Tower
Indianapolis, Indiana 46244–0363
Phone: 317/630–4000

The court has ordered the NCAA to answer the interrogatories by February 26, 1996. Since those answers will be based on completed questionnaires, those institutions that decide to complete the questionnaires should do so promptly and return them by February 23, 1996, to William Barnard at the above address. If NCAA counsel has not heard from any institution on or before February 23, 1996, it will be assumed that such institution does not wish to voluntarily complete the questionnaire. If the decision is made by complete the questionnaire, but the task cannot be completed by the February 23 deadline, please so advise Mr. Barnard as promptly as possible.

On February 26, 1996, the NCAA served "supplementary responses" to plaintiffs' third interrogatories.[12] It again provided no substantive answers to any of the questions posed, but stated that it had sent a survey on February 8, 1996, and that any information received in response to it would be provided. In response to Interrogatory Nos. 1 and 3, the NCAA also stated that it would produce what the parties in this case have branded the "Ursula documents," that is, "documents which contain some of the requested financial information and which the NCAA received from member institutions pursuant to an express pledge of confidentiality in connection with NCAA research studies of institutional finances and gender equity."[13] The NCAA also stated that it would provide computerized compilations of the data contained in the "Ursula documents," but that production of both the documents and the computer records was "subject to the entry of a mutually agreeable protective order."[14] As of March 13, 1996, the NCAA had not received any

12. Stephen R. Morgan, NCAA Chief of Staff—Division I, executed the interrogatory responses on behalf of the NCAA.

13. The documents are so designated in honor of Ursula Walsh, the NCAA's Director of Research, who obtains and analyzes data for revenue and expense reports and serves as custodian for the documents in question.

14. On October 3, 1995, the Court entered a protective order in this case. *Protective Order* (Doc. # 135). The NCAA nonetheless refused to disclose the "Ursula documents" on grounds of confidentiality. More than 60 days after NCAA interrogatory answers were due and the Court had overruled the NCAA objections and motion for a protective order, NCAA counsel still could not explain why the NCAA had failed to provide the documents or why the existing protective order was inadequate. NCAA counsel Mr. Barnard's "explanation" was as follows:

MR. BARNARD: We have not yet satisfactorily, and the Court's existing protective order isn't satisfactory in that regard, we have not yet worked out with the other side, if we can, some methodology for masking the identity or some way of coming to grips in a practical sense with giving them the information. * * * MR. STEWART [counsel for plaintiffs]: Mr. Barnard, why is the existing confidentiality order not sufficient for this information? MR. BARNARD: I don't know. I just know it isn't. I am prepared to sit down and talk to you why it isn't, okay. But I am not prepared to talk about that today. *Transcript of Hearing on January 26, 1996* (Doc. # 246) at 24, 25. Moreover, it appears that as of February 26, 1996—the date when the NCAA interrogatory answers were *due*—the NCAA had never even proposed a second protective order suitable to its alleged needs.

responses to its questionnaire. Moreover, it had not produced any of the documents or computerized compilations which it had agreed to produce. As a result, on March 13, 1996, plaintiffs filed a motion for sanctions. *Plaintiffs' Motion For Sanctions* (Doc. # 258).

As noted earlier, on March 19, 1996, the Court ordered the NCAA to show cause why sanctions up to and including entry of default judgment should not be imposed for its refusal to permit discovery. Three days later, on March 22, 1996, Mr. Dempsey sent a second memorandum to Division I members as follows:

> On February 8, 1996, I sent to each of you a memorandum describing the status of litigation involving restricted-earnings coaches and enclosed a questionnaire seeking information sought by the plaintiffs. To date, we have not received a response. The court now has indicated that it believes the NCAA did not seek the information in good faith and has set a hearing for next Friday, March 29, to determine what sanctions, if any, it may impose upon the NCAA. The court also has suggested that we telephone each Division I institution in an effort to obtain the information.
>
> NCAA counsel still believes that only you can decide, after consulting with your own counsel, whether to supply the information. Nevertheless, we urge you to cooperate in this telephone survey. An NCAA attorney will call your office early next week. I would appreciate it if you would designate an individual at your institution to be available to furnish us with the information. I have enclosed another copy of the questionnaire for your use.
>
> Thank you for your assistance in this most important matter.

The NCAA received no responses to the second memorandum and the following week, during the two or three days which immediately preceded the court hearing on sanctions, the NCAA contacted 305 Division I members by telephone. The stated purpose of the call was to "assure [the member] that the NCAA does not want to discourage you from completing the questionnaire." At the same time, the NCAA caller "wanted to make certain that [the member] underst[ood] that this is a decision which must be made on an individual basis." As of March 29, 1996, the telephone calls had predictably failed to yield a single survey response.

At the hearing on March 29, 1996, NCAA counsel conceded that the information requested in plaintiffs' third interrogatories is available to the NCAA.[15] NCAA executives and NCAA counsel nonetheless agreed that the NCAA would not to provide it in response to plaintiffs' third interrogatories. NCAA executives and counsel also had joint responsibility for the Dempsey memorandum of February 8, 1996, which discouraged member institutions from independently providing that information to plaintiffs.

## I. *The NCAA's Status as an Unincorporated Association*

The NCAA is an unincorporated association, which has been variously defined under federal law. *See Klinghoffer v. S.N.C. Achille Lauro,* 739 F.Supp. 854, 858 (S.D.N.Y. 1990) ("a body of persons acting together and using certain methods for prosecuting a special purpose or common enterprise"), *vacated on other grounds,* 937 F.2d 44 (2d Cir.1991) (citing *Motta v. Samuel Weiser, Inc.,* 768 F.2d 481, 485 (1st Cir.), *cert. denied,* 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 575 (1985)); *Hecht v. Malley,* 265 U.S. 144, 157, 44 S.Ct. 462, 467, 68 L.Ed. 949 (1924) ("a body of persons united without a charter but upon the methods and forms used by incorporated bodies for the prosecution of some common enterprise"); *Four Way Plant Farm, Inc. v. NCCI, et al.,* 894 F.Supp. 1538, 1546 (M.D.Ala.1995) (a collection of persons "created and formed by the voluntary action of a number of individuals in associating themselves together under a common name for the accomplishment of some lawful purpose").

---

15. More precisely, counsel stated as follows: "We are not disputing that [the information] is *available.* We are trying to get it. But we can- not give information that we, in fact, do not have." *Transcript of Hearing on March 29, 1996* (Doc. # 284) at 43.

■ As an unincorporated association, the NCAA is simply a collection of individual members. *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 461, 100 S.Ct. 1779, 1782, 64 L.Ed.2d 425 (1980). Under common law, it has no legal identity aside from its members, and therefore no capacity as a party litigant in its own name. *See, e.g., Moffat Tunnel League v. United States*, 289 U.S. 113, 118–19, 53 S.Ct. 543, 545–46, 77 L.Ed. 1069 (1933); *United Mine Workers of America v. Coronado Coal Co.*, 259 U.S. 344, 385, 42 S.Ct. 570, 574, 66 L.Ed. 975 (1922); *Four Way Plant Farm*, 894 F.Supp. at 1548 (common law rule required service of process on all members of unincorporated association). Rule 17(b)(1) of the Federal Rules of Civil Procedure modified the common law rule, however, insofar as it controls the NCAA's capacity as an unincorporated association to be sued in this case. Rule 17(b) provides in pertinent part as follows:

> ... capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States....

Under Kansas law, an unincorporated association is not a legal entity: it has no legal identity separate and apart from the members of which it is composed, and it has no right to or control over the property or business rights of its members. *Kansas Private Club Ass'n v. Londerholm*, 196 Kan. 1, 3–4, 408 P.2d 891 (1965). As a result, the NCAA can neither sue nor be sued in its own name under Kansas law. *See Van Deelan v. Eudora Amateur Baseball Ass'n*, 1993 WL 390376, *2 (D.Kan.1993); *Frey, Inc. v. City of Wichita*, 11 Kan.App.2d 116, 117, 715 P.2d 417 (1986). It is only by virtue of Rule 17(b)(1) that the NCAA stands before this Court with legal capacity to defend against plaintiffs'

claims under federal antitrust law. A brief comment on Rule 17(b)(1) and its intended function is therefore appropriate.

The adequacy of procedural devices for suing an association or its members has long been an overarching problem in federal jurisprudence. As noted above, a maxim of the common law was that an unincorporated association could not be a party to suit in any court. This rule provided substantial immunity to unincorporated associations, and "legal writers strongly criticized both the resulting inequities and the uncertain logic of the original distinction which made jural capacity depend upon incorporation." *Developments in the Law—Judicial Control of Actions of Private Associations*, 76 Harv. L.Rev. 983, 1081 (1963). Federal courts nonetheless embraced the common law rule until 1922, when in *United Mine Workers of America v. Coronado Coal Co.*, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975 (1922), the Supreme Court declared that a union defendant in a suit involving a federal question could properly be sued in its own name in a federal court although the forum state would not have recognized capacity. Uncertainty as to the breadth of the holding was resolved in 1938, when the Federal Rules of Civil Procedure were promulgated. *Developments, supra*, at 1082. That enactment included Rule 17(b), which provides that an association can be sued in its own name in a federal court on a federal claim, or when the forum state allows suits against the association.

The purpose of Rule 17(b)(1), insofar as it allows federal claims to be asserted against unincorporated associations in their own names, even if state law does not so provide, is to prevent state law from frustrating enforcement of federal rights.[16] *Klinghoffer*, 739 F.Supp. at 866 n. 9. In affording "entity treatment" to associations sued on federal claims, Rule 17(b)(1) addresses substantial concerns which were articulated by the California Supreme Court in *Daniels v. Sanitari-*

---

16. As mentioned, Rule 17(b) provides that in diversity cases, state law determines the association's capacity to sue or to be sued. A contrary rule would arguably offend the principle of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), since conferring such capacity would allow federal courts to entertain actions which could not be brought in a state forum. *Developments, supra*, at 1082–83.

*um Ass'n, Inc.*, 59 Cal.2d 602, 30 Cal.Rptr. 828, 832, 381 P.2d 652, 656 (1963), as follows:

> We must recognize that the society of today rests upon the foundation of group structures of all types, such as the corporation, the co-operative society, the public utility. Such groups must, of course, operate successfully within the society; one of the prerequisites to that functioning is, generally, liability to suit and opportunity for suit. To frustrate that viability by the imposition of outmoded concepts would be to impair the institutions as well as to impede the judicial process.

As a practical matter, affording "entity treatment" to associational defendants on federal claims eliminated the need to individually sue all members of the association or, if the membership was so large that joinder was impracticable, the need to maintain suit against the members as a class.[17]

 To the extent that Rule 17(b)(1) permits an unincorporated association to be sued in its own name, however, it is procedural only. *United Mine Workers v. Coronado Coal*, 259 U.S. at 390, 42 S.Ct. at 576; 7 C.J.S. *Associations* §§ 42, 47 (1980); 6 Am.

Jur.2d *Associations and Clubs* § 52 (1963). A statute or rule which permits an unincorporated association to be sued in its associate name creates no substantive status or rights where none existed before. *Id.* As a matter of substantive law, in the absence of a statute to the contrary, an association is not a legal entity separate from the persons or members who compose it. Early common law established that rule, and it still applies.[18] *Id.* at 244–45. Accordingly, even though the NCAA is properly subject to suit in its own name under Rule 17(b), it otherwise has no status or legal existence which is distinct from the members which compose it. The real parties in interest in this suit are the NCAA member institutions.[19] For jurisprudential purposes relevant to this discussion, the NCAA is a non-entity.

## II. *Associational Obligations with Respect to Interrogatory Answers*

 Rule 33(a) of the Federal Rules of Civil Procedure provides that any party may serve upon any other party written interrogatories to be answered, if the party served is

---

**17.** A state's grant of entity status also eliminated the practical difficulties of joinder, but it left many large unincorporated associations without meaningful access to federal courts in diversity cases because the citizenship of each member of the association had to be taken into account for purposes of diversity jurisdiction and plaintiff was required to show complete diversity. *See Navarro Savings Ass'n*, 446 U.S. at 461, 100 S.Ct. at 1782; *United Steelworkers of America v. R.H. Bouligny, Inc.*, 382 U.S. 145, 146–47, 86 S.Ct. 272, 272–73, 15 L.Ed.2d 217 (1965). The Rule 23 class action device allowed large associations access to a federal forum where jurisdiction would not otherwise exist, by the simple expedient of choosing a diverse member as class representative. *Tunstall v. Brotherhood of Locomotive Firemen and Enginemen*, 148 F.2d 403, 405 (4th Cir.1945); *Lumbermen's Underwriting Alliance v. Mobil Oil Corp.*, 612 F.Supp. 1166, 1169 (D.Idaho 1985). Moreover, in 1966 the Supreme Court adopted Rule 23.2 of the Federal Rules of Civil Procedure, which permitted an action to be brought against an unincorporated association by naming certain members of the association as representative parties. According to the advisory committee note to Rule 23.2, the rule's "real or main purpose" is "to give 'entity treatment' to the association when for formal reasons it cannot sue or be sued as a jural person under Rule 17(b)." Rule 23.2 is similar to Rule 17(b), in

that it provides a procedural mechanism for suit against association members individually, without the need to join all members individually or as a class under Rule 23. Rule 23.2 embodies the doctrine of "virtual representation," which acknowledges the right of a few persons to sue or defend on behalf of themselves and all members similarly situated. *Murray v. Sevier*, 156 F.R.D. 235, 242–43 (D.Kan.1994). Rule 17(b)(1) affords similar representational status to an associational defendant on federal claims.

**18.** Generally, state law determines whether unincorporated associations have legal existence and whether they may acquire and hold property, impose fiduciary obligations upon those who manage association property and affairs, govern the relationship of the association to its members and the relationship of the members, as among themselves. Any discrepancy between state law and federal practice raises potential problems with respect to *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1968), and should therefore be avoided.

**19.** When an association is afforded the procedural status of a legal entity in bringing or defending suit, it appears solely as a *representative* of the membership as a whole. 6 Am.Jur.2d *Associations and Clubs* § 52 (1963). It is the members of the association who are in fact prosecuting or defending the suit. *Id.*

an association, "by any officer or agent, who shall furnish such information as is available to the party." Under Rule 33(a), the fact that the other party is an association does not impede the opposing party's right to use interrogatories as a discovery device. And, although the association must respond through an answering officer or agent, its answers must speak of the composite knowledge of the party—whether or not that officer or agent has personal knowledge of the facts. 4A *Moore's Federal Practice* ¶ 33.07 at 33–46. Under Rule 33(a), while interrogatories must be served on the party, the party served has discretion in selecting the officer or agent who is to answer them and verify the answers. *Holland v. Minneapolis–Honeywell Regulator Co.,* 28 F.R.D. 595, 595 (D.D.C.1961); 4A *Moore's Federal Practice* ¶ 33.07 at 33–49. It is clear, however, that "whoever answers the interrogatories, the answers must include whatever information is available to the party." *Id.* at 33–50.

Case law that discusses what information is "available" to an unincorporated association, which has no identity separate from that of its members, is meager. *International Ass'n of Machinists, Dist. 169 v. Amana Refrigeration, Inc.,* 90 F.R.D. 1 (E.D.Tenn. 1978), stands virtually alone in its straightforward analysis of this issue. Plaintiff, an unincorporated labor organization, refused to answer interrogatories which requested information unknown to the answering agent individually but presumptively known to its members. The district court noted that "the fact that an answer is unknown to the answering agent individually does not mean that it is not known to the plaintiff in this lawsuit." *Id.* at 2. The court therefore ordered the answering agent to consult with "members of the organization who are in possession of the information sought" and then answer. *Id.* The court's comments in that regard are instructive on the issue before us:

> [T]he interrogatories were addressed to the unincorporated plaintiff. This labor organization acted vicariously of necessity, and the knowledge of all its officers and members was the knowledge of the labor organization. Notice of any fact acquired by one of its members while acting as an officer or member, concerning the business of the organization, was notice to the labor organization. In answering the interrogatories propounded to the labor organization, it was incumbent upon the organization to select an agent to answer them who could provide the information sought by the defendant. * * * The labor organization, as the party plaintiff herein, cannot avoid answering proper interrogatories … by saying the labor organization doesn't know the answer, when it can obtain the information sought from it from its members or other sources under its control.

*Id.* at 1–2 (citations omitted).

■ Consistent with the holding in *Amana Refrigeration,* the NCAA in this case was not entitled to avoid answering interrogatories by professing that it did not know (and could not get) the information requested. The NCAA routinely seeks such information, and NCAA members routinely supply it, for purposes related to the governance of intercollegiate athletics and the achievement of associational objectives. It may indeed be true that the NCAA does not get a 100 percent response rate to each survey which solicits information on a voluntary basis: response rates may vary with the type and length of the survey document, the tenor of the solicitation, the purpose to which the information will be put, and the personnel resources and response time available to the responding member.[20] Such information is clearly "available" to the NCAA, however, under any reasonable construction of the concept of availability. Moreover, as noted above, the NCAA admits that the requested information is available.

■ While this admission should end our inquiry under Rule 33(a), sadly it does not. The NCAA argues that information which is available to it under Rule 33(a) need not actually be *disclosed* unless it has the legal authority to *require* that it be produced from members whom it characterizes as third party strangers to this proceeding.

---

**20.** *See supra* note 2.

The NCAA's position in this regard is ill conceived. First, it confuses Rule 34 (which utilizes "possession, custody or control" as the test of a party's obligation to produce documents and other tangible things) with Rule 33 (which utilizes a more elastic standard of "availability" as the test of a party's duty to answer interrogatories). The NCAA cannot sidestep its duty to answer under Rule 33(a) by invoking Rule 33(d) then asserting that Rule 34 excuses it from any discovery obligation whatsoever. The NCAA's confusion on this point is basic, and it renders inapposite the cases on which the NCAA relies. *See, e.g., Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *United States v. 25.02 Acres of Land,* 495 F.2d 1398 (10th Cir.1974); *Searock v. Stripling,* 736 F.2d 650 (11th Cir.1984); *Read v. Ulmer,* 308 F.2d 915 (5th Cir.1962); *Oil Heat Institute of Oregon v. Northwest Natural Gas,* 123 F.R.D. 640 (D.Or.1988). Second, unlike the situation in the cases cited by the NCAA, we are dealing here with an inability which was created or fostered by the NCAA's own conduct and not by circumstances beyond its control.[21] *See, e.g., Societe Internationale v. Rogers,* 357 U.S. at 212, 78 S.Ct. at 1095–96 (sanction not justified where refusal to produce documents due to inability and not to willfulness, bad faith or fault of non-producing party); *Searock v. Stripling,* 736 F.2d at 654 (dispositive issue is not "control," but whether party made good faith effort to obtain documents requested under Rule 34 and whether after making good faith effort he was unable to obtain and thus produce them); *Read v. Ulmer,* 308 F.2d at 918 (court cannot decide whether party had "ability" to produce under Rule 34 without considering whether party made reasonable effort to comply and was unable to do so). In our

case, the NCAA affirmatively encouraged its members to *withhold* information for the purpose of defeating plaintiffs' legitimate interrogatories. Its conduct was willful, in bad faith, and expressly calculated to frustrate the Court's orders with respect to discovery.

Finally, the NCAA's argument ignores the obvious fact that NCAA member institutions are not third party strangers to this proceeding. They are the real parties in interest. They appear in this case through the NCAA, which is their surrogate and representative but is otherwise for jurisprudential purposes a non-entity. The relationship between the NCAA and its members is not—as the NCAA suggests—analogous to the relationship between a corporation and its shareholders or between a corporation and its wholly-owned subsidiaries. The legal personality of a corporation is fundamentally distinct from that of an unincorporated association, and the NCAA's failure to account for the differences is fatal to its position. The information which plaintiffs requested is routinely maintained by NCAA members, either for their own benefit or for associational purposes, and it is periodically communicated on a voluntary basis to the NCAA. Indeed, based on information of precisely the type requested here, NCAA members adopted the so-called "restricted earnings coach rule" which, as the Court has determined, violates federal antitrust law. The requested information clearly concerns the business of the association. The NCAA was obligated to consult with members of the association who possessed the information sought, and then answer plaintiffs' interrogatories.

### III. *Sanctions for Failure to Answer Interrogatories*

The NCAA flouted the Court's order that it answer plaintiffs' third interrogatories by

---

21. The plain definition of "available" connotes both that which is "immediately utilizable" and that which is "accessible or may be obtained." *Webster's Third New International Dictionary* (1986). "Availability" is necessarily an elastic concept, because what is "available" cannot be determined without reference to the efforts made to secure it. We need not further examine the metaphysical boundaries of the concept of "availability," however, for two reasons. First, the NCAA concedes that the information re-

quested is available. Second, the only effort that the NCAA exerted with respect to that information was to make it *un*available. We have no reason to believe that the information would have been unavailable in the face of a good faith effort to secure it. Even if we assume that some fractional percentage of NCAA members would not answer the interrogatories voluntarily on initial request, the NCAA's concession that the information is available renders moot any further examination of this issue.

February 26, 1996. Rule 37(b)(2) provides that if a party fails to obey an order to provide discovery under Rule 37(a), the Court "may make such orders in regard to the failure as are just. . . ." Rule 37(b)(2) sets forth possible sanctions, including orders that certain facts be taken as established or evidence excluded, that claims or defenses be unopposed or pleadings struck, that reasonable expenses caused by the recalcitrant party be paid, and that the party be held in contempt.

█ In determining which sanctions should be imposed, the Court must consider the purposes to be served by the imposition of sanctions. In *White v. General Motors Corp.*, 908 F.2d 675, 683 (10th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991),[22] the Tenth Circuit outlined those purposes as including (1) deterring future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management. The primary goal of sanctions is to deter misconduct. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398, 110 S.Ct. 2447, 2457, 110 L.Ed.2d 359 (1990).

In this case, the NCAA defaulted on its discovery obligations in two respects: (1) failing to produce the "Ursula documents" by November 17, 1995, or within a reasonable time thereafter, and (2) refusing to answer or otherwise adequately respond to plaintiffs' remaining third interrogatories. Because the reasons and the remedies for each default are distinct and appropriate sanctions will therefore vary, the Court considers each in turn.

A. *Failure to Produce the "Ursula Documents"*

█ Plaintiffs served their third interrogatories on October 17, 1995. In its responses, served November 16, 1995, the NCAA

objected to producing the "Ursula documents" because, it claimed, they contained information submitted by NCAA members under assurances of confidentiality. The ink was not dry on the NCAA's objection, however, when it decided not to press the point. NCAA counsel communicated to plaintiffs that subject to an agreed protective order, under Rule 33(d), the business records designated as the "Ursula documents" would be produced in lieu of interrogatory answers. More than two months passed, however, with no production and no apparent effort by the NCAA to craft a protective order suitable to its alleged concerns.[23] On January 26, 1996, the Court ordered the NCAA to respond no later than February 26, 1996. Again the NCAA did not comply. After the Court's deadline passed, the NCAA started to *prepare* to comply by initiating efforts to negotiate a second protective order. As of March 13, 1996, however, the NCAA still had not complied, and plaintiffs filed their motion for sanctions. Only after plaintiffs filed their motion did the NCAA finally, on March 20, 1996, produce the "Ursula documents."

█ A delinquent party cannot avoid sanctions, after the filing of a motion to compel or for sanctions, by then making the response that should have been made earlier. *Case v. U.S.D. No. 233*, 162 F.R.D. 147, 148–49 (D.Kan.1995). Rule 37(a)(4)(A) clearly calls for sanctions in the form of expenses and attorneys' fees when a party makes disclosure after a motion to compel has been filed with the court, unless the court finds that the motion was filed without the movant first making a good faith effort to obtain the disclosure or discovery without court action, that the opposing party's non-disclosure or objection was substantially justified, or that other circumstances make an award of fees and expenses unjust. When the Court sustained plaintiffs' motion to compel on January 26, 1996, and ordered the NCAA to

---

**22.** While *White* involved sanctions under Rule 11, its principles apply equally to sanctions under Rules 26 and 37. *See Parker v. Housing Authority of Kansas City, Kansas*, 1990 WL 126816, *1 (D.Kan.1990).

**23.** At the hearing conducted on January 26, 1996, NCAA counsel offered no explanation for

the delay, except lack of an agreed protective order. When pressed to explain why the Court's existing protective order of October 3, 1995, offered insufficient protection, he basically had nothing to say. To date, the Court has no idea why a second protective order was necessary.

answer the third interrogatories by February 26, 1996, plaintiffs did not push the question of sanctions, and the Court did not seriously address it. In retrospect, it should have done so. As of January 26, 1996, the Court was apprised of no circumstances which would have made an award of fees and expenses unjust. The NCAA's position with respect to sanctions became even less defensible on February 26, 1996, when it refused to comply with the Court's second order compelling answers to plaintiffs' third interrogatories. The NCAA's effort to negotiate a second protective order, initiated *after* the deadline for compliance had passed, does not demonstrate a good faith effort to work with the judicial process but evidences by its timing a further attempt to interfere with it.[24] The Court finds that sanctions are appropriate and that they should include (1) public censure of the NCAA and its attorneys William C. Barnard, Gayle A. Reindl, John J. Kitchen and Linda J. Salfrank; and (2) an order which requires that the NCAA and the foregoing counsel reimburse plaintiffs for 125 percent of the expenses and attorneys' fees which plaintiffs incurred in making the subject motion for sanctions.[25] The Court cannot simply overlook the fact that the NCAA waited until March 20, 1996, to provide information to which plaintiffs were entitled on November 17, 1996, and that it defied two direct court orders in the interim. Because the "Ursula documents" have now been disclosed, public censure is the minimum sanction that is necessary, and the Court can only hope that it will be sufficient to deter future misconduct by the NCAA, by its counsel, and by others. A monetary award is also necessary to reimburse plaintiffs the expenses and attorneys' fees which they incurred in making the subject motion to compel. An unenhanced order for compensation would be remedial, and no circumstances of record would render such an award unjust. Such an order would have no meaningful deterrent effect, however, for the NCAA, its counsel or others. As noted elsewhere in this opinion, the NCAA is *already* subject to liability for payment of all costs and fees which plaintiffs have incurred and will incur on account of the NCAA's established violation of federal antitrust law. The Court finds that a 25 percent surcharge is a reasonable sanction and that it is the least severe penalty that will serve to deter future misconduct.

### B. *Failure to Disclose Information Possessed by Member Institutions*

 In its initial response to plaintiffs' third interrogatories, the NCAA objected that aside from the "Ursula documents" and limited information in its possession, it did not have and could not get the information requested. The Court overruled this objection, along with the NCAA's corollary motion for a protective order, on the ground that the information was not unavailable to the NCAA and thus beyond the pale of Rule 33(a). Without requiring that it adopt any particular methodology or language, the Court ordered the NCAA to get the information from its members and to prepare supplemental interrogatory answers by February 26, 1996. Counsel responded that the NCAA would do so and that the deadline was not a problem.

Ten days later, the NCAA sent to its members a survey and a purported request that it be completed and returned to defense counsel in this case. Notwithstanding the NCAA's current claim to the contrary, the memorandum of February 8, 1996, was palpably and authoritatively intended to discourage responses.[26] It had precisely that effect. For what was apparently the first time in NCAA history, the association propounded a

---

24. While NCAA counsel has attempted to excuse his client's behavior in other respects on the ground that it is a "very complex business organization that doesn't make decisions easily," *see* Transcript of Hearing on May 3, 1996 (Doc. #297) at 37, this circumstance cannot excuse its refusal to produce the "Ursula documents" within a reasonable time after November 17, 1996.

25. Pursuant to the directive of *Barrett v. Tallon*, 30 F.3d 1296, 1303 (10th Cir.1994), the Court

has determined that responsibility for breach of defendants' discovery obligations lies jointly with NCAA executives and defense counsel.

26. The NCAA and its counsel understand the English language. While they claim that they did not intend to discourage responses, a fair reading of Mr. Dempsey's memorandum points emphatically to the opposite conclusion.

survey to which *no one* responded.[27] And the NCAA did much more: by the tenor of its communications with its members, the NCAA contaminated the information-gathering process. Given these communications, the Court finds that (1) NCAA executives and defense counsel acted in bad faith in drafting and distributing the survey request; (2) as a result of their conduct, volumes of information that would otherwise have been freely communicated to the NCAA has been and will be withheld by member institutions except on a non-voluntary basis; and (3) the NCAA has neither the ability nor the willingness to "unring" the bell that it has rung in this regard. Needless to say, the NCAA's response to the Court's order of January 26, 1996, was more than inadequate: it was contemptuous, malicious and calculated to severely delay and frustrate the discovery process.

Commensurate sanctions are called for, and the Court would not hesitate to dispense them if NCAA executives and counsel were the real parties in interest in this case. The member institutions, however, are the real parties in interest.[28] From the record presented, the Court assumes that they have no complicity in the foregoing discovery misconduct. The Court also assumes that they, like plaintiffs, are interested in the orderly dissemination of relevant information in a cost-effective and efficient manner and that their

27. The NCAA also understands surveys, and it knows exactly what it is doing when it comes to collecting information from its members. The NCAA frequently surveys its members to collect information similar to that requested by plaintiffs in this case and receives extraordinary response rates from Division I members on a timely, voluntary basis.

28. At a more basic level, student athletes have a fundamental stake in this action because intercollegiate athletics is presumably *about* student athletes, and their interests are disadvantaged to the extent that judicial sanctions consume resources otherwise available to athletic programs and educational institutions.

29. NCAA members are aware of the Court's ruling that the NCAA is liable under § 1 of the Sherman Act for violating federal antitrust law and of the further fact that, on account of that ruling, the NCAA is subject to liability for treble

interest in strategic gamesmanship does not extend to the judicial arena.[29]

■ Based on these assumptions, and other circumstances of record, the Court finds that this case presents the rare circumstance in which a Court may properly override the NCAA's choice of its representative to answer plaintiffs' third interrogatories. *Black Panther Party v. Smith*, 661 F.2d 1243, 1258 n. 99 (D.C.Cir.1981) (Rule 37(b) gives court broad discretion to fashion "such orders as are just" and includes, in rare circumstances, the power to require persons other than an organization's original representative to respond to interrogatories), *vacated on other grounds*, 458 U.S. 1118, 102 S.Ct. 3505, 73 L.Ed.2d 1381 (1982). The Court therefore orders that the NCAA transmit said interrogatories to each Division I member institution, with a copy of this order, by May 31, 1996. The member institutions shall answer the interrogatories, under oath, and transmit their answers to counsel for plaintiffs by July 5, 1996. If any member institution appropriately elects to produce business records in lieu of answers, under Rule 33(d), the records must be *produced* and not merely tendered to plaintiffs by July 5, 1996. Objections to plaintiffs' third interrogatories will not be entertained.[30]

In the event of any failure or refusal to comply with this order, the consequences will be severe. At a minimum, they will include the following:

damages, along with the costs and attorneys' fees which plaintiffs incur in this case. For the period ending October 31, 1995, the Court has already awarded plaintiffs $463,602.70 in costs and attorneys' fees. *See Memorandum and Order* (Doc. # 286) filed April 18, 1996. Ironically, the restricted earnings rule was calculated to *save* money or—in the contemporary words of Eugene Corrigan, Commissioner of the Atlantic Coast Conference and Chair of the Cost Reduction Committee which proposed the restricted earnings coach rule—to "save us from ourselves." One may question whether the benefits of the restricted earnings rule, even under a best case scenario, could possibly equal or exceed the cost of the litigation in defense of that rule—especially given the NCAA's litigation strategy to date.

30. The Court previously considered and rejected all objections urged by the NCAA on behalf of its members.

(1) Beginning on July 6, 1996, the Court will impose a discovery sanction of $100 per day per member institution for each member that has not fully complied with its obligations under this order. Any sanction so imposed shall be the joint and several responsibility of the NCAA and its counsel. Lesser sanctions will not suffice to deter the NCAA or its counsel from further interference with the discovery process.[31] Nor would lesser sanctions serve the interests of justice.[32]

(2) As to any member institution which fails or refuses to comply with this order by August 5, 1996, the Court will enter partial default judgment against the NCAA on the issue of damages and/or other relief. The default order will provide that if the Court's entry of summary judgment be set aside on appeal, the default judgment will also relate to the issue of liability under federal antitrust law.

(3) The NCAA and its counsel will pay the costs and attorneys' fees which · plaintiffs have incurred in obtaining this order. Liability for payment of said fees and expenses shall be joint and several as between the NCAA and the attorneys listed above [33] and, as ordered above, shall include a 25 percent surcharge.

### *Conclusion*

As mentioned above, federal case law with respect to the discovery obligations of unincorporated associations is scanty. Rule 17(b) makes it clear that unincorporated associations may be sued in their own name, however, in actions brought to vindicate federal rights. The Supreme Court has repeatedly recognized that unincorporated associations may indeed be held liable on such claims. *See, e.g., NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 930, 102 S.Ct. 3409, 3434–35, 73 L.Ed.2d 1215 (1982); *American Soc'y of Mechanical Engineers v. Hydrolevel Corp.,* 456 U.S. 556, 569–73, 102 S.Ct. 1935, 1944–46, 72 L.Ed.2d 330 (1982); *United Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 385, 42 S.Ct. 570, 574, 66 L.Ed. 975 (1922). Between the filing of suit and the entry of final judgment, the Court must construe and administer the Federal Rules of Civil Procedure in such a way as to secure the just, inexpensive and speedy resolution of each case.

The NCAA's position with respect to its discovery obligations is inconsistent with the tenets of Rule 1, Rule 17(b), Rule 33(a)—as well as the irrefutable proposition that NCAA members, and not the NCAA staff and attorneys, are the real parties in interest in this case. The NCAA cannot subvert the discovery process by erecting a fictional barrier between it and its members, to serve its own interests, when in fact the NCAA has no identity or existence separate from that of its members. Such a result would be inconsistent with both substantive common law and federal procedural law and would impose enormous obstacles to the orderly process of discovery. The ability to sue an association in its own name would be a hollow right if the association and its members, once hailed into court, were shielded from discovery. The NCAA's position for all practical purposes would deprive plaintiffs on federal claims of the federal forum which Rule 17(b) promises, and it must therefore be rejected.

**IT IS THEREFORE ORDERED,** with respect to *Plaintiffs' Motion for Sanctions* (Doc. # 258) filed March 13, 1996, as follows:

1. On or before May 31, 1996, the NCAA shall transmit to each Division I member a copy of plaintiffs' third interrogatories, along with a copy of this order.

2. Division I members of the NCAA shall answer plaintiffs' third interrogatories, under oath, on or before July 5, 1996, by serving

---

**31.** Far from admitting that it has failed to permit discovery in a fair and good faith manner, the NCAA insists on the utterly fantastic proposition that it never even violated a court order with respect to plaintiffs' third interrogatories.

**32.** The requested information is critical to plaintiffs' case.

**33.** Pursuant to the directive of *Barrett v. Tallon,* 30 F.3d 1296, 1303 (10th Cir.1994), the Court has determined that responsibility for breach of defendants' discovery obligations lies jointly with NCAA executives and defense counsel.

their responses on the following counsel for plaintiffs:

W. Dennis Cross, Esq.
Lori R. Schultz, Esq.
MORRISON & HECKER
2600 Grand Avenue
Kansas City, Missouri 64108–4606

If any member elects to produce business records in lieu of answering plaintiffs' third interrogatories, in circumstances appropriate under Rule 33(d), the documents shall be physically produced and not merely tendered to plaintiffs by July 5, 1996.

3. The NCAA and its counsel, William C. Barnard, Gayle A. Reindl, John J. Kitchen and Linda J. Salfrank, are hereby publicly censured for their failure to timely produce the so-called "Ursula documents" in response to plaintiffs' third interrogatories served October 17, 1996.

4. The NCAA and its counsel, William C. Barnard, Gayle A. Reindl, John J. Kitchen and Linda J. Salfrank, are hereby ordered to pay the reasonable expenses and attorneys' fees which plaintiffs incurred on account of their failure to permit discovery, plus a 25 percent surcharge, both with respect to the "Ursula documents" and the discovery otherwise requested in plaintiffs' third interrogatories. Said liability shall be joint and several. If counsel cannot agree on the amount of the attorneys' fees and expenses to be awarded, plaintiffs' counsel by July 5, 1996, shall file an appropriate motion under the procedure set forth in D.Kan. Rule 54.2.